1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TYCKO & ZAVAREEI LLP**
Annick M. Persinger (State Bar No. 272996)
483 Ninth St., Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
Facsimile: (510) 210-0571
E-Mail:   apersinger@tzlegal.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (State Bar No. 181547)
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
E-Mail:  hzavareei@tzlegal.com

*Counsel for Plaintiff*
*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMY EVANS, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>     v.<br><br>DSW, INC.,<br><br>                              Defendant. | Case No. 2:16-cv-03791-JGB-SP<br><br>**REPLY DECLARATION OF ANNICK M. PERSINGER IN SUPPORT OF PLAINTIFF'S MOTION FOR DETERMINATION OF WHETHER PLAINTIFF IS A SUCCESSFUL PARTY UNDER A CATALYST THEORY**<br><br>Hon. Jesus G. Bernal<br><br>REDACTED VERSION OF EXHIBIT 107 PROPOSED TO BE FILED UNDER SEAL |

I, Annick M. Persinger, declare as follows:

1. I am an attorney at law licensed to practice in the State of California. I am also a member of the bar of this Court and a partner at Tycko & Zavareei LLP, counsel of record for Plaintiff Evans. I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would competently testify thereto under oath.

2. Attached hereto as **Exhibit 107** is a true and correct copy of excerpts from the March 15, 2018 30(b)(6) Deposition of Julie Roy, DSW Vice President of Customer Relationship Management, Digital and Analytics.

3. Attached hereto as **Exhibit 108** is a true and correct copy of the 11/17/2017 sign-in sheet kept in JAMS records in their normal course of business. The sign-in sheet reflects my attendance at the parties' mediation with Judge Infante.

4. Attached hereto as **Exhibit 109** is a true and correct copy of Mark Armstrong & Yongmin Chen, *Discount Pricing* 5 (Univ. of Oxford, Dep't of Econ., Discussion Paper Series No. 605, 2012).

5. Attached hereto as **Exhibit 110** is a true and correct copy of Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?,* 11 J. PUB. POL'Y & MARKETING 52, 56 (1992).

6. Attached hereto as **Exhibit 111** is a true and correct copy of Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail*, (Harvard Bus. Sch., Working Paper, 2017).

7. Ms. Sheridan states under penalty of perjury in her declaration that "'Ms. Persinger's testimony that 'At the parties' 2017 mediation, Plaintiff's counsel made clear that any deal would have to include a practice change component' (Dkt. 89-1) lacks foundation, as I do not believe that Ms. Persinger attended the mediation. Plaintiff was represented at the mediation by Kristin Law Sagafi. DSW informed Ms. Sagafi at the mediation that the company was planning to change its pricing practices for reasons

independent of this case. This presumably is what caused Plaintiff to direct discovery to DSW on this topic." *See* Sheridan Decl. ¶ 10. While Ms. Sheridan states that she does not believe that I was at the mediation, during the first hour of the mediation, I met with Ms. Sheridan, as well as her associate, Ms. Meegan Brooks, along with Judge Infante, Kristen L. Sagafi, and Avi Kaufman.

8.      DSW also states in its Opposition that "Although Plaintiff submitted a declaration from her counsel, Annick Persinger, concerning the mediation, there is no record from JAMS that Ms. Persinger actually attended the mediation." Opp. at 5, n. 2. That is incorrect. At my direction, on May 23, 2018, my legal assistant Chloe H. Noh obtained Exhibit 108 from JAMS, the sign in sheet from the parties' mediation, which serves as  a record of my attendance at the mediation. Ms. Noh obtained this record with a simple phone call.

9.      The argument on the plaintiff's appeal in *Chowning* took place just one week ago on May 17, 2018. Before DSW changed its practices, Evans intended to move for a Rule 23(b)(2) and a Rule 23(b)(3) class, and felt confident that even though there is a district court split on Rule 23(b)(3), at the very least, a Rule 23(b)(2) class would be certified.

10.     As such, based on the current posture of this case, the tens of thousands of dollars in costs and out of pocket costs, including expert costs, and the hundreds of currently uncompensated attorney hours placed a burden on Evans out of proportion to her individual stake in the matter.

11.     Evans' stake in this action is small—the ability to shop at DSW in the future, the value of the discount that was represented and never received, and, if the Court approves it based on her work in the case, an incentive award. She committed her time. She searched for and produced hundreds of pages of documents, she reviewed court filings, and prepared to be cross-examined by DSW at her depositions.

I declare under penalty of perjury under the laws of the United States and the State

of California that the foregoing is true and correct. Executed on May 24, 2018 at

Oakland, California.


Dated: May 24, 2018                    Respectfully submitted,


By: _____ /s/ Annick M. Persinger _____
                                       Annick M. Persinger

**TYCKO & ZAVAREEI LLP**
Annick M. Persinger (State Bar No. 272996)
483 Ninth St., Suite 200
Oakland, CA  94607
Telephone: (510) 254-6808
Facsimile: (510) 210-0571
Email:  apersinger@tzlegal.com

# EXHIBIT 107

1            IN THE UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4     _____

5     AMY EVANS, individually and on

6     behalf of all others similarly

7     situated,

8                    Plaintiff,

9          vs.                      Case No.

10    DSW, INC.,                    2:16-cv-03791-JGB

11              Defendant.

12    _____

13

14        VIDEOTAPED DEPOSITION OF JULIE ROY

15             Thursday, March 15, 2018

16                  10:33 a.m.

17                 Taken at:

18       41 South High Street, Suite 210

19                Columbus, OH

20

21    Reported by:

22    Rebecca Williams

23    JOB No. 2835659

24

25    PAGES 1 - 235

                                        Page 1



Page 112



Page 113



Page 114



Page 124



Page 126



Page 130



Page 131



Page 132



Page 161



Page 162

# EXHIBIT 108

Case Name: _Evans_ _vs_ _DSW_

Hearing Date(s): _Nov 17, 2017_

Panelist: _Judge Infante_

| Name | Party(ies) Represented | Position |
|---|---|---|
| Avi Kaufman | Plaintiff | Atty |
| Annick Persinger | '' | '' |
| Kristen Law Sagafi | '' | '' |
| Meegan Brooks | D | '' |
| Stephanie Sheridan | D | '' |
| _(signature)_ | D | '' |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT 109

*ISSN 1471-0498*



# DEPARTMENT OF ECONOMICS

# DISCUSSION PAPER SERIES

## DISCOUNT PRICING

**Mark Armstrong and Yongmin Chen**

Number 605
May 2012

Manor Road Building, Oxford OX1 3UQ

# Discount Pricing[*]

Mark Armstrong
Department of Economics
University of Oxford

Yongmin Chen
Department of Economics
University of Colorado at Boulder

May 2012

## Abstract

This paper investigates *discount pricing*, the common marketing practice whereby a price is listed as a discount from an earlier, or regular, price. We discuss two reasons why a discounted price—as opposed to a merely low price—can make a rational consumer more willing to purchase the item. First, the information that the product was initially sold at a high price can indicate the product is high quality. Second, a discounted price can signal that the product is an unusual bargain, and there is little point searching for lower prices. We also discuss a behavioral model in which consumers have an intrinsic preference for paying a below-average price. Here, a seller has an incentive to offer different prices to identical consumers, so that a proportion of its consumers enjoy a bargain. We discuss in each framework when a seller has an incentive to offer false discounts, in which the reference price is exaggerated.

**Keywords:** Reference dependence, price discounts, sales tactics, false advertising.

# 1   Introduction

In his account of sales practices, Cialdini (2001, page 12) writes about

> the Drubeck brothers, Sid and Harry, who owned a men's tailor shop [...] in the 1930s. Whenever Sid had a new customer trying on suits in front of the shop's three-sided mirror, he would admit to a hearing problem and repeatedly request that the man speak more loudly to him. Once the customer had found a suit he liked and asked for the price, Sid would call to his brother, the head tailor, at the back of the room, 'Harry, how much for this suit?' Looking up from his work—and greatly exaggerating the suit's true price—Harry would call back, 'For that beautiful, all wool suit, forty-two dollars.' Pretending not

---
[*]We are grateful to David Gill, Salar Jahedi, Andrew Rhodes, Mike Riordan, Rani Spiegler, John Vickers and Jidong Zhou for helpful discussions.

1

> to have heard and cupping his hand to his ear, Sid would ask again. Once more
> Harry would reply, 'Forty-two dollars.' At this point, Sid would turn to the
> customer and report, 'He says twenty-two dollars.' Many a man would hurry
> to buy the suit and scramble out of the shop with his [...] bargain before poor
> Sid discovered the 'mistake'.

As this anecdote suggests, consumers are more likely to buy an item if they perceive it to be a bargain. This is easily understood when the consumer is given an *accidental* discount, as occurs for instance if she sees that the product she wants has been given the wrong price tag. If the product's genuine price—which reflects its cost, quality and/or competitive environment—is $42, but by chance the consumer can get the product for $22, this represents genuine value-for-money and will make the consumer more inclined to purchase. This rational response to an accidental discount is exploited by the Drubecks' fraudulent sales tactics.

What is more of a challenge is to explain why consumers might care about receiving a *deliberate* discount from a seller, as opposed simply to obtaining a low price. For instance, a consumer may be more likely to buy a jacket priced at $100 accompanied by a sign which reads "50% of its previous price" than he/she would be if the price were merely stated as $100. Alternatively, a retailer might claim its price was $100 even though the "manufacturer's recommended price" was $200. Despite its prevalence, this pricing practice—which we term *discount pricing*—has apparently received little economic analysis. In the literature on sales (for instance, Lazear 1986), consumers care only about the price level, and whether a low price is framed as a discount off a higher price plays no role. In this paper, we explore the economics of discount pricing, focussing on the potential information content of a discount and its strategic implications. Our analysis is developed in two models that suggest different reasons why rational consumers care about discounts, as well as in a third model with behavioural consumers.

First, in section 2, uninformed consumers rationally take a monopoly seller's initial price as a signal of its choice of quality, and so are willing to pay more for the product when they observe the initial price was high. The firm sells its product to two groups of consumers, one of which can accurately determine the product's quality while the other group, the casual buyers, cannot. The monopolist can price discriminate between the two consumer groups using inter-temporal pricing, and the second group can use the price offered to the first group, when they observe it, as an indicator of quality. In this framework, it is more likely that the firm has an incentive to supply a high-quality product when casual buyers

can observe its initial price. Thus, the firm's ability to write "was $200, now $100", if credible, may induce it to provide a high-quality item.

In the second model, presented in section 3, the knowledge that a product is offered at a discounted price induces consumers to buy immediately rather than investigate a rival's price. Two firms compete to sell to consumers, and either firm offers one of two prices: a full price or a sale price. (Price variation is generated by exogenous demand variation.) When a product is offered on sale, a consumer buys immediately even if that price is relatively high, and so a consumer cares about whether a discount is offered rather than the level of the actual price. If a consumer is given no credible information about whether the current price is discounted or not, she must judge how likely it is that the next price will be higher, given the current price, and buy accordingly. This inability to fine-tune her search process can cause welfare losses.

In our third model, in section 4, consumers intrinsically care about getting a bargain. Studies in behavioral economics (discussed shortly) have focused on how "reference prices", which can sometimes be manipulated by a seller's marketing activities, affect purchase decisions. In our model, a bargain is a price below the firm's average offered price. If consumers observe the firm's prices to all consumers, the firm responds to the "demand for bargains" by offering distinct prices to otherwise identical consumers. If the demand curve is concave, the firm follows a simple "high-low" pricing strategy with just two prices, a full price and a sale price. If instead consumers see only their own price, but hold equilibrium beliefs about the average price, the firm again has an incentive to pursue a high-low policy, but one with lower prices relative to when consumers see the prices offered to all consumers. When its prices are secret, the firm has a greater incentive to undercut its anticipated average price to some consumers, since others do not see this price cut and cannot react to it.

If, for whatever reason, consumers care about getting a discount, a seller may have an incentive to exploit this by making false claims about its previous or regular price. The outcome when these deceptive marketing tactics are used depends on the "savviness" of consumers. If consumers are aware that sellers are able to misrepresent their reference price without penalty, they will simply regard such sale signs as puffery and pay them no attention. The result is that a potentially useful channel of information is absent. However, if instead consumers are more gullible and believe a firm's false claims (when such claims are plausible), the outcome is worse, as these consumers may be induced to pay more for the product than they would otherwise.

3

The media regularly features stories in which a seller's claimed discounts are alleged to be fictitious. For instance, a supermarket's heavily advertised 15% average price reduction may have been preceded by an unadvertised gradual price rise cancelling out the reduction. In Britain, a legal case involved the "Officers Club" chain of clothing stores, where it was alleged that only a tiny share of sales were made at the regular price and the great majority of items were sold at "70% off" this supposed regular price.[1] Several jurisdictions have rules in place to combat false discounting.[2] In the United States, the Federal Trade Commission's *Guides Against Deceptive Pricing* (para. 233.1) distinguishes between genuine and fictitious discounts. For instance, "where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the 'bargain' being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the 'reduced' price is, in reality, probably just the seller's regular price."[3]

There are a number of earlier contributions which discuss issues related to our models. Our first model, where an initial price of a product signals its quality, builds on a large literature which studies how (current) price can signal quality. For instance, Bagwell and Riordan (1991) present a model where a firm has private information about the exogenous quality of its product. They find that high and declining prices signal high product quality: the firm distorts its price above the full-information level in order to signal high quality, and, as more consumers become informed, there is less price distortion in later periods. While their motivation is different from ours and their insights are derived mainly in a setting where the firm's current price signals quality, they also consider an extension where consumers can observe the firm's past price. In this case, the firm's prices may be more distorted in period 1 but less distorted in period 2, compared to when past price is not observed, and they find that the high-quality firm has an incentive to reveal past price information to uninformed consumers. Thus, when a firm makes sequential sales of a product, the exogenous quality of which is the firm's private information, a policy that

---

[1] The England and Wales High Court (Chancery Division) found that the seller engaged in "misleading advertising". See details in the judgement of 26 May 2005 of Justice Etherton of the case between the Office of Fair Trading and The Officers Club Ltd., www.bailii.org/ew/cases/EWHC/Ch/2005/1080.html. For instance, in paragraph 16 of this judgement, it states that between 1 September 2002 and 28 June 2003 only 0.15% of the total number of items sold in the chain of stores were at the "full price". The judgement also discusses similar cases in other countries, such as *Colorado vs. May Department Stores* in the United States (para. 59), and *Commissioner of Competition vs. Sears Canada Inc.* in Canada (para. 63).

[2] Some jurisdictions also have policies to prevent permanent sales by requiring all sales to occur on stipulated dates. Thus the winter sales in Paris in 2012 had to take place between 11 January and 14 February.

[3] This document can be downloaded from www.ftc.gov/bcp/guides/decptprc.htm.

bans false discounts would boost profit.

Muris (1991, section IIIC) and Rubin (2008, section III) discuss how the FTC has ceased fighting fictitious pricing cases in recent years, in part because it was often rival sellers—not consumers—who used the FTC's *Guides* to prevent a firm's heavy discounting, and in part because of a perception that any focus on price was potentially pro-competitive. However, our second model in section 3 suggests that complaints by rivals about a firm's false sales can have a procompetitive motive: false discounts discourage consumers from investigating rival offers and deprive the rivals of opportunity to compete effectively. In these settings, preventing false discounting can lead to more effective competition.

Models and experiments from psychology and behavioral economics offer a number of insights on the use of discount pricing.[4] Thaler (1985) proposes a model of consumer behaviour in which the context of a transaction matters to a consumer as well as the transaction itself. One implication of this theory is that firms can profit from a high "suggested retail price", which serves as a reference price, and a lower selling price may then provide consumers with a "transaction utility". Bordalo, Gennaioli and Shleifer (2012) develop a model of salience in consumer decision making, which they use to explain a number of perplexing phenomena. Their analysis suggests that, by raising consumers' valuation of quality through salience, firms can benefit from "misleading sales"—artificially inflating the regular price and simultaneously offering a generous discount. Jahedi (2011) experimentally investigates a kind of "bargain" which we do not study in this paper, where a seller offers two units of its product for little more than the price of one unit. He shows how consumers are less likely to buy two units when faced with the choice from {buy nothing, buy two units for $1} than they are when faced with the larger choice set {buy nothing, buy one unit for $0.97, buy two units for $1}. Jahedi designs the experiments so that subjects know that prices have no signaling role (such as the signaling roles we analyze in our first two models), and deduces that his subjects have an intrinsic "taste for bargains".

Our third model is a model with consumer reference dependence, where consumers also have a taste for bargains. Spiegler (2011a, section 9.4.2) briefly outlines a related model, although his construction perhaps uses implausibly high prices (higher than any consumer's raw valuation for the product). Most existing models of consumer reference dependence

---

[4]Experimental evidence that consumers are influenced by false sales is discussed by Urbany, Bearden and Weilbaker (1988). They also found more generally that an advertised reference price—plausible or exaggerated—raised consumers' estimates of the firm's regular price and the perceived offer value, and reduced consumer search for other sellers.

focus instead on loss-aversion, where a consumer's propensity to buy falls when offered a price above her reference point. See Heidhues and Kőszegi (2005), Spiegler (2011b), Puppe and Rosenkranz (2011) and Zhou (2011) for models involving consumer loss aversion. Much of this literature finds that loss aversion makes a firm's prices more rigid, for instance in response to cost variation, than would be the case in a "standard" model. By contrast, when consumers are bargain-loving, we show that a firm is *more* inclined to vary its prices than otherwise.

## 2   Initial Price as Signal of Product Quality

In this section we modify a standard static model of quality choice so that the firm sells over time.[5] Specifically, a monopolist supplies a product over two periods, with its price in period $t = 1, 2$ denoted $p_t$, and chooses its quality *ex ante* which is then fixed for the two periods. The firm can choose one of two quality levels, $L$ and $H$, and it has constant unit cost $c_i$ if it chooses quality $i = L, H$. All consumers have unit demand. For simplicity, suppose the firm aims to maximize the sum of profits in the two periods.

A fraction $\sigma$ of consumers are *keen* and particularly interested in the product: they can discern the product's quality, and they are impatient and wish to buy only in period 1. Their valuation is $v_i$ for the product when its quality is $i = L, H$. The remaining $1 - \sigma$ consumers are *casual* buyers: they cannot directly observe quality and buy for simplicity only in period 2. (Little of substance in the analysis would be affected if some casual buyers also purchased in the first period.) Their valuation for the product is $\theta v_i$ when quality is $i = L, H$, where the parameter $0 < \theta \leq 1$ reflects the plausible situation where casual buyers have a lower willingness-to-pay for the item. To avoid discussing sub-cases involving non-supply, we assume that

$$\theta v_L > c_H \tag{1}$$

so that the high-quality product can profitably be sold even to casual buyers who think quality is low. We also assume that providing the high-quality product is socially efficient, so that

$$[\sigma + (1 - \sigma)\theta] \Delta_v > \Delta_c , \tag{2}$$

where $\Delta_v \equiv v_H - v_L$ and $\Delta_c \equiv c_H - c_L$.

---

[5]This static model is taken from Tirole (1988, section 2.3.1.1), which itself incorporates elements from a number of earlier contributions.

We study market equilibrium under alternative information assumptions. A consumer buys the item if the price is no higher than her willingness-to-pay, which depends on observed (if the consumer is keen) or anticipated (if casual) product quality. The firm's strategy consists of its choice of quality and its two prices. In equilibrium the firm's strategy is optimal given consumer buying behaviour, while the expectations of product quality by casual buyers, which may depend on observed prices, are consistent with the firm's strategy.

Consider first the case where the casual buyers do not observe the firm's initial price. A casual buyer's anticipated quality might depend on the period-2 price. However, all that matters for the firm is the *maximum* price, say $P$, which induces a casual buyer to buy the product. (If the firm is going to sell to casual buyers it should set the highest possible price, regardless of its chosen quality.) Clearly, we have $\theta v_L \leq P \leq \theta v_H$, since the value of the item to the casual buyers is known to lie between these extremes. From (1), it is profitable to sell to these casual buyers, regardless of their beliefs about quality. Thus, given $P$, the firm's profit if it chooses to supply the high-quality product is

$$\sigma(v_H - c_H) + (1 - \sigma)(P - c_H) \ ,$$

while its profit if it supplies the low-quality product is

$$\sigma(v_L - c_L) + (1 - \sigma)(P - c_L) \ .$$

Comparing these two profits, we see that if

$$\sigma > \frac{\Delta_c}{\Delta_v} \ , \tag{3}$$

the unique equilibrium is for the firm to provide a high-quality product, and the firm's prices fully extract consumer surplus so that $p_1 = v_H$ and $p_2 = \theta v_H$. Thus, if the fraction of informed buyers is large enough, the firm makes more profit by serving these buyers with their preferred product than by supplying a low-cost product to all consumers. By contrast, if $\sigma < \Delta_c/\Delta_v$ the unique equilibrium is to provide a low-quality product, and prices are $p_1 = v_L$ and $p_2 = \theta v_L$. We summarize this discussion as:

**Lemma 1** *Suppose that casual buyers cannot observe the firm's initial price. If the fraction of keen buyers is large enough that (3) is satisfied, the unique rational expectations equilibrium is for the firm to supply a high-quality product, and to choose prices which fully extract consumer surplus (i.e., $p_1 = v_H, p_2 = \theta v_H$). If the fraction of keen buyers is small enough that (3) is strictly violated, the unique rational expectations equilibrium is for the*

7

*firm to supply a low-quality product, and to choose prices which fully extract consumer
surplus (i.e., $p_1 = v_L, p_2 = \theta v_L$).*

Consider next the case where casual buyers do observe the initial price. For instance,
they see a price label which truthfully states "was $200, now $100". A similar argument
to that used for Lemma 1 establishes that when (3) holds, providing high quality is the
unique equilibrium. But now, even if (3) fails, high quality can be supported in equilibrium.
Specifically, suppose the firm chooses a particular initial price $p_1$ such that $v_L < p_1 \leq v_H$.
Suppose given $p_1$ that the maximum price which induces the casual buyers to buy is $P$,
where as before $P$ lies in the range $\theta v_L \leq P \leq \theta v_H$. Then the firm's profit if it supplies a
high-quality product is

$$\sigma(p_1 - c_H) + (1 - \sigma)(P - c_H) ,$$

while its profit if it provides a low-quality product is

$$(1 - \sigma)(P - c_L) .$$

(For this last expression, note that the firm does not sell to the informed buyers since
$v_L < p_1$.) Thus, supplying a high-quality product is more profitable if

$$\sigma(p_1 - c_L) > \Delta_c . \tag{4}$$

In particular, we see that a higher initial price makes it more likely that offering a high-
quality product is profitable, and in this sense a high initial price acts as a signal to casual
buyers that quality is high. The reason is that a high initial price makes deviating to low
quality more costly for the firm: if it deviates to low quality, it must forego serving the keen
(informed) buyers and serving these buyers is more profitable with a higher initial price.
Setting $p_1 = v_H$ in (4) implies that first-best profit—where the firm supplies a high-quality
product and chooses prices $p_1 = v_H$ and $p_2 = \theta v_H$— is feasible if $\sigma(v_H - c_L) > \Delta_c$, i.e., if

$$\sigma > \frac{\Delta_c}{\Delta_v + [v_L - c_L]} . \tag{5}$$

If this condition does not hold, there is *no* initial price which could convince casual buyers
that quality is high. In this case the firm supplies a low-quality item and fully extracts the
resulting consumer surplus.

Since condition (5) is less stringent than (3), we deduce that efficient quality provision
is easier to achieve when the initial price is observed by casual buyers. When (5) holds but
(3) does not, there is another equilibrium with low quality. As is usual in signaling games,

8

this multiplicity of equilibrium is due to the arbitrariness of beliefs off the equilibrium
path. For clear-cut statements in the rest of this section, we assume that beliefs off the
equilibrium path satisfy the "forward induction" refinement: when seeing a price off the
equilibrium path, casual buyers reason what quality the firm could have rationally chosen
given this price; if it is always optimal for the firm to choose $q$, then their belief is that
quality is $q$. Then, when (5) holds, high quality is the unique equilibrium.[6]

We summarize this discussion as:

**Lemma 2** *Suppose that casual buyers can observe the firm's initial price. If the fraction of
keen buyers is large enough that (5) is satisfied, the unique rational expectations equilibrium
is for the firm to supply a high-quality product, and to choose prices which fully extract
consumer surplus (i.e., $p_1 = v_H, p_2 = \theta v_H$). If the fraction of keen buyers is small enough
that (5) is strictly violated, the unique rational expectations equilibrium is for the firm to
supply a low-quality product, and to choose prices which fully extract consumer surplus
(i.e., $p_1 = v_L, p_2 = \theta v_L$).*

If the firm can credibly reveal its initial price to casual buyers, then when the fraction
of keen buyers lies in the range

$$\frac{\Delta_c}{\Delta_v + [v_L - c_L]} < \sigma < \frac{\Delta_c}{\Delta_v} \tag{6}$$

the firm will wish to do so. (When the fraction lies outside this range, communicating
its initial price to casual buyers has no impact, as anticipated quality cannot be affected
by the firm's initial choice of price.) Welfare—which equals profit in this setting with full
extraction of consumer surplus—also rises in this case.

We summarize the discussion as:

**Proposition 1** *Relative to a setting where casual buyers cannot observe the initial price,
if the firm can credibly communicate the initial price to casual buyers, this weakly (strictly
if condition (6) holds) increases product quality, profit and welfare.*

Now consider the scenario in which the firm is able to make any claim—true or false—
about its initial price. If casual buyers are aware that the firm can make false claims about
its discount without penalty, they will "discount the discount" and behave just as if they

---

[6]At the potential low-quality equilibrium (with $p_1 = v_L$ and $p_2 = \theta v_L$), consider a deviation to high
quality with $p_1 = v_H$ and $p_2 = \theta v_H$. Since with $p_1 = v_H$ it is always optimal for the firm to choose quality
$H$, regardless of what $P$ is, the forward induction refinement implies that the casual buyers must believe
that the firm has chosen $H$ upon seeing $p_1 = v_H$. This eliminates the low-quality equilibrium.

do not observe the initial price. When the fraction of keen buyers lies in the range (6), a policy which prevents firms making false claims about discounts will induce the firm to switch from offering a low-quality to a high-quality product, which will boost profit and welfare. The policy opens up a useful channel of information to otherwise uninformed buyers. In particular, if the casual buyers are savvy in this manner, the firm will *welcome* a policy which forbids it from making fictitious discount claims.

However, casual buyers might instead be "gullible" and believe the firm's claims about its initial price when such claims are plausible. For instance, they might mistakenly think that effective consumer policy is already in place to prevent misleading price claims.[7] If the fraction of keen consumers lies in the range (6), then faced with these more gullible casual buyers the firm would not switch to offering a high-quality product. Instead, the firm would produce a low-quality product, actually offer the initial price $p_1 = v_L$ to the keen buyers, but claim to casual buyers that its initial price was $p_1 = v_H$, who can therefore be charged price $p_2 = \theta v_H$. The outcome is poor for casual buyers, who suffer negative consumer surplus. Thus, in the case with gullible consumers a policy which prevents misleading claims about initial prices not only ensures efficient quality choice (as was the case with savvy consumers), but now improves consumer welfare and reduces profit.

The idea that consumers care about a seller's initial price because it signals product quality can be applied to other settings. Consider, for instance, the following variant of Lazear's (1986) model of clearance sales. Suppose that the firm has only one unit of a product to sell, and that the quality of its product, denoted $v$, is exogenous, uncertain, and initially unobserved even by the firm itself.[8] In the first period, a keen consumer who observes $v$ considers buying the product, and will buy if the initial price $p_1$ is below $v$. If he chooses not to buy the product, a casual consumer in the second period considers whether to buy. The casual buyer does not directly observe $v$, and bases her purchase decision on the expected value of $v$, conditional on the item not having sold in the first period. In this setting, total supply is limited, and when the casual buyer sees the item on sale in period 2, she knows that demand from the keen buyer was low. This causes her to lower her estimate of quality. But the information content of the event that the item ends up on sale is less when the initial price was high, as fewer informed consumers would have been willing to buy at a higher price. That is, expected quality, conditional on the item remaining unsold,

---

[7]In an environment where casual buyers do not observe initial prices, there is no difference between "savvy" and "gullible" consumers, and both make rational inferences about a firm's choice of quality.

[8]In the fashion context, for example, $v$ might represent whether or not the product's colour or cut is fashionable that season, which is not something the firm knows in advance.

is higher when the initial price was higher.[9] Hence, initial price again acts as a signal of quality, albeit for a reason very different to that in our endogenous quality model. It can be shown, however, that in this setting firm profit is lower, and consumer surplus is higher, when the initial price is *not* observed. (We will obtain a similar result in our model presented in section 4.)

## 3   Discounts as a Signal to Buy Immediately

A second reason why consumers like a discounted price is because this may signal the price is unusually low, and they would do well to take advantage of it. This signal could potentially operate in two dimensions. In a monopoly context where the firm sets different prices over time, a discounted rather than full price might indicate the price is likely to go up, and the consumer should buy immediately rather than wait for a lower price. Alternatively, in a static oligopoly search context, a discounted price from one seller could indicate that rival prices are likely to be no lower, and there is little reason to investigate other sellers when search is costly. In this section we explore the latter possibility. (The dynamic monopoly model can be analyzed in a very similar manner.)

Before describing the analysis in detail, we point out that to investigate the question at hand we need a framework which is more complicated than standard models of search. As usual, we require a framework with price dispersion so that consumers sometimes have an incentive to search for a lower price. However, in order to discuss the impact of discounted prices, as opposed to merely low prices, we need the pattern of price dispersion itself to be uncertain from the consumer's point of view. For instance, if the consumer knew the potential prices were $p_L$ and $p_H$, then if she first encounters $p_L$ she knows the other price is either $p_L$ or $p_H$ and so does not benefit from additional information about whether the price is discounted.

In more detail, suppose two firms compete to sell a homogeneous product to consumers. The two firms sell repeatedly over time, although all consumers are short-lived and can buy only in their own period. A firm's price is either $p_L$ or $p_H > p_L$ in each period with the probability of the latter being $\alpha$, and price is independently realized in each period and across firms. We refer to $p_L$ as the "sale" (or discounted) price and $p_H$ as the "regular" (or full) price. The market parameters $(p_L, p_H, \alpha)$ are unchanging over time. Thus the regular and the sale prices are the same for both firms, although with probability $2\alpha(1 - \alpha)$ one

---

[9]In Lazear's model, the second consumer is also well informed about $v$, and so does not care about the initial price.

firm runs a sale while its rival does not. For now we take the process of price determination to be exogenous. (The model will be "closed" in a particular way shortly.)

Suppose there are a number of "searchers" who are imperfectly informed about market prices. Specifically, they can travel to their local firm for free and see its price and, if desired, buy immediately from that firm (with an equal proportion of consumers local to each firm), but they need to incur a cost $s_1$ to travel to the second, to them more remote, firm and discover its price. Suppose a consumer can return to buy from her local firm after investigating the remote firm by incurring the further search cost $s_2$. Suppose prices are such that these searchers will always wish to buy the product from one firm or the other.

The ideal search rule for such a consumer, given known tariff parameters $(p_L, p_H, \alpha)$, is simple. If the consumer knows the local price is the sale price she will buy immediately, as the rival's price cannot be lower. If the consumer knows the local price is the full price, she may decide to investigate the rival's price in case it turns out to be discounted. If her local firm offers $p_H$, the risk-neutral consumer has an incentive to investigate the remote firm whenever $p_H \geq s_1 + \alpha p_H + (1-\alpha)p_L$, i.e., when the expected sale discount $(1-\alpha)(p_H - p_L)$ satisfies

$$(1-\alpha)(p_H - p_L) \geq s_1 \ . \tag{7}$$

If the local price is the full price, the consumer will nevertheless buy locally if (7) does not hold, as it is not worth incurring the search cost to obtain the small expected discount at the rival. A consumer will never return to buy from her local firm after travelling to the remote firm. This ideal stopping rule depends on whether the local product is offered on sale, and on the size and frequency of the sale discount, but not on price *levels*.

Now suppose a consumer is initially offered price $p$ from her local firm, without any credible information about whether this price is discounted. She must then decide whether to buy immediately purely on the basis of the price level. Moreover, a consumer might sometimes return to buy locally after travelling to the remote firm, thus incurring a double search cost $s_1 + s_2$. Suppose that tariff parameters $(p_L, p_H, \alpha)$ are uncertain from the viewpoint of the consumer. A consumer conditions the distribution of rival's price $\tilde{p}$ on the local firm's price $p$, and a consumer who sees local price $p$ will buy immediately if and only if

$$p \leq s_1 + \mathbb{E}[\min\{\tilde{p}, p + s_2\} \mid p] \ . \tag{8}$$

Here, the right-hand side is the expected expense involved if the consumer travels to the remote firm: the search cost $s_1$ is sunk, but then the consumer has the ability to buy from whichever supplier is cheaper (after taking the cost of returning to the local seller into

account). The search rule in (8) will in general be inefficient compared to the search rule when the consumer knows when the local price is the discounted price, and so we expect that credible information about discounts will benefit consumers.

To investigate in more detail, we specialize and close the model in the following manner. Here, the firms' price variation is generated by local demand shifts.[10] Specifically, suppose in each period there are also a number of "inert" consumers can buy only from their local firm (to which they can travel costlessly). These consumers have unit demand, and their valuation for the unit can take one of three values: $V_L, V_M$ or $V_H$, where $0 < V_L < V_M < V_H$. The market operates in one of two states. In the first state, the possible valuations are $\{V_L, V_M\}$, and in any period and for either firm these two demand realizations are equally likely. In the other state, the possible valuations are $\{V_M, V_H\}$ and again these two demand realizations are equally likely. Each market state $\{V_L, V_M\}$ or $\{V_M, V_H\}$ is realized *ex ante* with equal probability. A firm knows which market state is realized, but in a given period does not observe its rival's local demand realization. Suppose each firm's production is costless.

The searchers are willing to pay up to $V_H$ for a single unit and their search costs are $s_1 = s_2 = s$, where $0 < s < V_H - V_M$. (The condition $s < V_H - V_M$ will ensure that the consumer will return to buy locally if she discovers the remote price is higher.) The key feature of this set-up is that when a searcher knows that local demand is $V_M$, she does not know if the market state is $\{V_L, V_M\}$ or $\{V_M, V_H\}$. We will derive an equilibrium in which each firm sets its price to fully extract surplus from their inert consumers, i.e., a firm chooses $p = V_i$ when its realized local demand is $V_i$. Intuitively, this pricing behaviour is an equilibrium whenever the proportion of searchers is small enough, as then a firm's incentive to extract surplus from the inert consumers dominates the incentive to keep the searchers from investigating the rival firm.

For now, take as given this pricing rule by firms. What is the optimal search rule for the searchers? From (8), and given $s < V_H - V_M$, a consumer has an incentive to travel to the remote firm when the local price is $p = V_M$ (and then to travel back to the local firm if the remote price turns out to be $p = V_H$) if and only if

$$s \leq \tfrac{1}{5}(V_M - V_L) \ . \tag{9}$$

A consumer has an incentive to travel to the remote firm when the local price is $p = V_H$ if

---

[10]There are other ways to close the model. For instance, we might have inert consumers with a constant downward-sloping demand curve, and each firm has idiosyncratic shocks to its unit cost.

and only if

$$s \leq \tfrac{1}{2}(V_H - V_M) \ . \tag{10}$$

(Of course, a consumer will buy immediately if she is offered the lowest price $V_L$.) A complicating factor is that this search rule may not be monotonic; that is, a consumer might search on when she sees the intermediate price $p = V_M$ but not if she sees the highest price $p = V_H$. The reason is that in the latter case, the consumer knows that the low price $p = V_L$ is not a possibility, and it might be that this chance of the low price is what drives search incentives when $p = V_M$. This possibility is ruled out if condition (9) implies condition (10), i.e., if $\tfrac{1}{2}(V_H - V_M) \geq \tfrac{1}{5}(V_M - V_L)$. In particular, if the search cost is small enough that

$$s < \tfrac{1}{5}(V_M - V_L) \leq \tfrac{1}{2}(V_H - V_M) \ , \tag{11}$$

the optimal search rule is to buy immediately if the local price is $p = V_L$ and otherwise to travel to the remote firm. (If the local price is $p = V_M$ and the remote price is $p = V_H$, the consumer will then return to buy locally.) Of course, this search rule is inefficient, as when the market state is $\{V_M, V_H\}$ and the consumer is first offered price $p = V_M$, she travels to the remote firm even though the price cannot be lower there. Nevertheless, the consumer always buys the product at the cheapest price available.

The following result describes market equilibrium when consumers do not know whether their local price is discounted or not:

**Lemma 3** *Suppose parameters satisfy (11). Provided the proportion of searchers in the consumer population is sufficiently small, the following strategies make up an equilibrium when searchers have no credible information about whether the local price is discounted: (i) each firm sets its price to extract surplus fully from their inert consumers, i.e., a firm chooses $p = V_i$ when its realized local demand is $V_i$, and (ii) searchers buy immediately if the local price satisfies $p \leq V_L$ and otherwise they travel to the remote firm.*

**Proof.** We have already shown that this search rule is optimal given the claimed price choice by firms. To see that firms optimally price in the stated way given this consumer search rule whenever the proportion of searchers is sufficiently small, argue as follows. Suppose the number of inert consumers is $N$ and the number of searchers is $n$. Suppose for instance that the market state is $(V_L, V_M)$ and a firm's demand realization is $V_M$. If the firm follows the stated strategy and sets price $p = V_M$, its expected profit is $V_M(\tfrac{1}{2}N + \tfrac{1}{4}n)$ since its $\tfrac{1}{2}N$ inert consumers will buy and the $\tfrac{1}{2}n$ searchers local to the rival firm will buy from it if the rival price is also $V_M$, which occurs with probability $\tfrac{1}{2}$. (The firm's local searchers

14

will never buy from it.) If the firm deviates to price $p = V_L$, its profit is $V_L(\frac{1}{2}N + \frac{3}{4}n)$, since now the firm's local searchers will buy from it as well. The latter profit is below the former when $\frac{n}{n+N}$ is small. Another potentially profitable deviation is to set price $p = V_M - s$, which will induce all searchers to buy from it in the event the rival price is $p = V_M$, and so generates profit $(V_M - s)(\frac{1}{2}N + \frac{1}{2}n)$. This is below $V_M(\frac{1}{2}N + \frac{1}{4}n)$ whenever the proportion of searchers satisfies $\frac{n}{n+N} < \frac{2s}{V_M}$. Similar arguments apply in other situations. ∎

Note that if searchers *could* observe whether a firm's price was discounted or not, the equilibrium outcome would be that a searcher buys immediately if and only if the local price was discounted, and firms continue to set prices to reflect local demand conditions.[11] Thus, a simplifying feature of this particular framework is that equilibrium prices are not affected by policy towards misleading pricing.

Suppose the market initially operates in a regime where nothing except the current price is revealed to consumers. When does a firm have an incentive to reveal more details about its pricing policy? The firm's aim is simple: regardless of its current price state, it wishes to deter its local consumers from travelling to the remote firm. Suppose first that a firm can only make truthful claims about its prices. When the market state is $\{V_M, V_H\}$, a firm will announce that its price is discounted when $p = V_M$, as this will induce searchers to buy immediately (while otherwise they would have travelled to the other firm). Consumers are better off if they know when the local price is discounted, as this helps to refine their search strategy.

However, a firm has an incentive to mislead consumers, and falsely to claim its regular price is discounted. If firms are free to do so without penalty, savvy consumers will treat any claimed discount as cheap talk—they recognize that a firm will claim a price $p = V_M$ is discounted, regardless of whether the market state is $\{V_L, V_M\}$ or $\{V_M, V_H\}$—and so the outcome is as if consumers do not know whether or not the good is on sale. If instead consumers are more gullible, they believe a firm's false claims whenever such claims are possible. In this framework, this implies that when the market state is $\{V_L, V_M\}$ and a seller's price is $p = V_M$, the firm can claim its price is discounted (i.e., that the market state is $\{V_M, V_H\}$) and induce gullible consumers to buy immediately. (However, these consumers are not so gullible that they believe a firm's claim that its price $p = V_H$ was discounted.)

Expected expenditure from the searchers in the various regimes can be calculated as

---

[11]Condition (11) implies that a consumer will travel to the remote firm if the offered price $p = V_M$ when the consumers know the market state is $\{V_L, V_M\}$.

follows. In the regime where searchers do not know when a price is discounted, a searcher's expected outlay (including search costs where incurred) is[12]

$$\tfrac{3}{8}V_L + \tfrac{1}{2}V_M + \tfrac{1}{8}V_H + \tfrac{7}{8}s \ . \tag{12}$$

Likewise, when a searcher knows when a price is discounted, her expected outlay is

$$\tfrac{3}{8}V_L + \tfrac{1}{2}V_M + \tfrac{1}{8}V_H + \tfrac{1}{2}s \tag{13}$$

since she searches less often (although she makes exactly the same purchase decision). Finally, if the consumer is more gullible and always believes the price $p = V_M$ is discounted, her outlay is

$$\tfrac{1}{4}V_L + \tfrac{5}{8}V_M + \tfrac{1}{8}V_H + \tfrac{1}{4}s \ . \tag{14}$$

Here, relative to the other regimes, the consumer searches too little and ends up with a more expensive product on average.

In sum, in this stylized framework a policy which prevents firms from making misleading claims about discounts is good for consumers. With such a policy, a firm will always reveal when its price is discounted, and this enables consumers to improve their search strategy. Absent the policy, a firm will always claim its product is on sale, and consumers will be worse off: savvy consumers will disregard the permanent sale signs and search in ignorance of whether the local price is discounted or not; more gullible consumers will fall victim to the sale signs and too rarely search for a lower price. Industry profits are not affected by policy when consumers are savvy, as consumers make exactly the same purchase decisions in either regime. However, if consumers are more gullible, policy which prevents misleading price claims will reduce profits, as consumers are more likely to search for a better deal.

In general, the impact of policy on welfare depends on the underlying process of price determination, i.e., on whether profit margins are higher or lower when price is high or low. However, the impact is easy to understand in this framework where unit costs do not vary, since the prices paid by consumers are merely a transfer to firms and have no impact on welfare. Welfare is then inversely related to how much search occurs in the various regimes. By inspecting expressions (12)–(14), we see that welfare is highest when consumers are gullible and firms mislead them with false sales, for then search is rare. If instead consumers are savvy and disregard false sale signs, then policy to prevent misleading

---

[12]For instance, in this regime a consumer will pay the lowest price $V_L$ when the market state is $\{V_L, V_M\}$ and at least one of the two firms has price $p = V_L$, which together occur with probability $\tfrac{3}{8}$. The consumer makes a costly trip with probability $\tfrac{7}{8}$, since she searches when the local price is not $V_L$ and she makes *two* trips when the local price is $V_M$ and the remote price is $V_H$.

16

sales signs reduces the intensity of search and so boosts welfare. In sum, while the impact
of policy on consumers alone is clear-cut in this model, the impact on overall welfare is
more complex and depends on the presumed gullibility of consumers.

We summarize this discussion as:

**Proposition 2** *In the oligopoly search setting, when firms provide accurate information
about when their price is discounted this benefits consumers relative to the situation where
no such information is available. Consumers buy immediately when they see a discounted
price. A policy which prevents firms from falsely claiming discounts will benefit consumers
regardless of whether or not consumers believe false sales signs. The impact on welfare
depends on whether consumers are gullible or savvy.*

# 4   Selling to Bargain-Loving Consumers

In our final model of discount pricing, we suppose that consumers intrinsically like the idea
of getting a bargain. Thus, unlike models in sections 2 and 3, here we do not derive why
it is that consumers care about receiving a discount, but simply take this as given. The
model here, then, is a behavioural model with reference dependence. Unlike recent papers
in industrial organization which focus on loss-aversion, we take the less familiar route of
supposing consumers also enjoy a benefit if they pay a price below the reference price. In
our model, the reference price is simply the average price offered by the firm.[13]

Suppose that a monopolist sells to a unit mass of consumers with constant marginal cost
$c$, and chooses its price according to a mixed strategy with c.d.f. $G(p)$ which has expected
value $\bar{p}$. (The firm offering a deterministic price as a special case of this framework.) Note
that a given consumer is offered a single price, and cannot search for additional prices. To
be concrete, we might imagine that the firm makes its price contingent on some arbitrary
aspect of the consumer (e.g., location) which cannot easily be altered, and so pricing is
not strictly random. Suppose a consumer's "raw" valuation for the item is $v$, which has
smooth distribution function $F(v)$. If the consumer is given a "rip-off" price $p \geq \bar{p}$ then
she buys if $v - \lambda_R(p - \bar{p}) \geq p$, where $\lambda_R \geq 0$ is a parameter which reflects her aversion

---

[13]An important ingredient of any model with reference dependence is how the reference point is deter-
mined. Broadly speaking, Heidhues and Kőszegi (2005) take the reference price to be the price a consumer
expect to pay if she decides to buy, while Spiegler (2011b) takes the reference price to be the expected
price *offered* by the seller (where that expected price is a random price draw from the firm, as might be
generated by "word of mouth" for example). Puppe and Rosenkranz (2011) describe a model in which a
manufacturer's non-binding "recommended retail price" acts as the reference price for consumers, while
Zhou (2011) studies an oligopoly model in which consumers take the price of one "prominent" seller as
their reference price when they evaluate other offers.

to paying above-average prices. If the consumer gets a bargain price $p \leq \bar{p}$ then she buys if $v + \lambda_B(\bar{p} - p) \geq p$, where $\lambda_B \geq 0$ is a parameter which reflects her enjoyment of the bargain.

Consider to start with the case where consumers are accurately informed about the firm's price policy (in particular, they know the average price $\bar{p}$, which, together with their own price, is what they care about). First, we show that it is always profitable for the monopolist to offer dispersed prices in this context, provided that consumers care more about getting a bargain than they do about avoiding a rip-off:

**Lemma 4** *When consumers can observe the firms price policy, the firm prefers to offer dispersed prices than a uniform price when*

$$\lambda_B > \lambda_R \tag{15}$$

**Proof.** Let $p > c$ represent any profitable uniform price (not necessarily the most profitable uniform price). Suppose the firm deviates from this uniform price by offering two prices, $p_L = p - \varepsilon$ and $p_H = p + \varepsilon$ where $\varepsilon > 0$, where each price is offered to half the consumer population. (This modified strategy leaves the average price unchanged at $p$.) The firm's profit with this new strategy is

$$\pi(\varepsilon) \equiv \tfrac{1}{2}(p + \varepsilon - c)(1 - F(p + [1 + \lambda_R]\varepsilon)) + \tfrac{1}{2}(p - \varepsilon - c)(1 - F(p - [1 + \lambda_B]\varepsilon)) \ .$$

Differentiating this expression with respect to $\varepsilon$ shows that

$$\pi'(0) = \tfrac{1}{2}(p - c)f(p)[\lambda_B - \lambda_R] > 0 \ ,$$

where $f(\cdot)$ is the density associated with $F(\cdot)$. Thus, starting from any profitable uniform price, profit is increased by implementing a mean-preserving spread in its prices. ∎

The intuition for this result is clear. Relative to a uniform price strategy, adding a small amount of noise to prices reduces demand from those consumers offered above-average prices and boosts demand from those who get a bargain, and given (15) the latter effect dominates. We deduce that the firm has an incentive to offer at least two prices when consumers are more bargain-loving than loss-averse. Clearly, if only a fraction of consumers had these preferences (while the rest were "rational" and cared only about their own price), the firm would still have an incentive to pursue this dispersed pricing policy. If instead consumers were more loss-averse than bargain-loving, so $\lambda_B < \lambda_R$, then the firm has no (local) incentive to disperse its prices. In sum, the presence of bargain-loving consumers

18

gives the firm an incentive to offer distinct prices to otherwise identical consumers: in order to satisfy a "demand for bargains", the firm creates bargains by artificially dispersing its prices.

If we assume that the demand curve $1 - F$ is weakly concave, one can show that the firm will use *only* two prices in its optimal pricing policy. In order to derive this optimal policy, we suppose that the firm is restricted to offer prices which are sometimes accepted by consumers. (Or equivalently, that consumers ignore any price which is so high that demand at that price is zero when they calculate the average price.) Let $v_{\max}$ be the maximum valuation in the support of $v$. (Since the demand curve is concave, we know there is such a valuation.) Stated precisely, the firm is restricted to choose a price policy such that

$$p_{\max} + \lambda_R(p_{\max} - \bar{p}) \leq v_{\max} \ , \tag{16}$$

where $p_{\max}$ is the firm's maximum offered price and $\bar{p}$ is its expected offered price. This assumption rules out a strategy in which the firm offers arbitrarily high prices to a tiny fraction of consumers, which are not accepted, which would then make $\bar{p}$ arbitrarily large without significant cost to the firm.[14]

**Lemma 5** *Suppose consumers have a preference for bargains in the sense that (15) holds and can observe the firm's price policy. If demand $1 - F(v)$ is weakly concave and the firm chooses prices which satisfy (16), the firm wishes to use exactly two prices in its pricing scheme.*

**Proof.** To avoid technicalities, suppose the firm offers a finite number of distinct prices (at least two in number), where price $p_i$ is offered to a fraction $\alpha_i > 0$ of consumers and average price is $\bar{p} = \sum_i \alpha_i p_i$. Clearly, at least one price is strictly above the mean and one price is strictly below the mean.

Note first that it cannot be optimal for the firm to set any price below cost. (If some prices were below $c$, then profit is strictly increased by adjusting such prices to equal $c$: this adjustment increases $\bar{p}$ and so boosts demand from all consumers with $p_i \geq c$, and it clearly increases profit from these hitherto loss-making consumers.) So suppose that all prices satisfy $p_i \geq c$.

Next, we claim that the firm optimally offers only one price which is strictly above the mean. (The following argument is essentially an instance of Jensen's Inequality.) Suppose,

---

[14]A more satisfying solution to this problem would be for consumers to construct the "average price" in terms of the average *accepted* price among the consumer population instead of the firm's average offered price. However, this alternative approach is substantially more complex to solve.

to the contrary, there are at least two distinct prices, say $p_1$ and $p_2$, where $p_1 > p_2 > \bar{p}$. Suppose we reduce $p_1$ by $\varepsilon > 0$ and increase $p_2$ by $\frac{\alpha_1}{\alpha_2}\varepsilon$, where $\varepsilon$ is small enough that both prices remain above $\bar{p}$ and that (16) continues to hold. By construction, the average price $\bar{p}$ is not affected by this change, and so the profits obtained from all other prices $p_i \notin \{p_1, p_2\}$ are unaffected. If we write $\pi(\varepsilon)$ for the firm's expected profits as a function of $\varepsilon$, then

$$\pi'(0) \stackrel{sign}{=} [F(p_1 + \lambda_R(p_1 - \bar{p})) - F(p_2 + \lambda_R(p_2 - \bar{p}))]$$
$$+ (1 + \lambda_R)[(p_1 - c)f(p_1 + \lambda_R(p_1 - \bar{p})) - (p_2 - c)f(p_2 + \lambda_R(p_2 - \bar{p}))] \ .$$

This expression is strictly positive: the first term $[.]$ is strictly positive since $F(.)$ is strictly increasing over this range, and the second term $[.]$ is strictly positive from the assumption that $1 - F$ is weakly concave. We deduce that the original prices cannot be optimal, and so the firm chooses exactly one price above the average price in its optimal policy.

A similar argument shows that the firm's optimal policy also involves a single price which is weakly below the mean. ∎

At least with concave demand, we deduce that the firm uses exactly two prices and so pursues a "high-low" price policy. It is then a simple matter to derive the firm's optimal price policy. If the firm offers the full price $p_H$ with probability $\alpha$ and the discounted price $p_L < p_H$ with probability $1 - \alpha$, its profit is

$$(1-\alpha)(p_L-c)[1-F(p_L-\lambda_B\alpha(p_H-p_L))]+\alpha(p_H-c)[1-F(p_H+\lambda_R(1-\alpha)(p_H-p_L))] \ . \ (17)$$

Consider the example where $v$ is uniform on $[0,1]$, $c = 0$ and $\lambda_R = 0$. Here, the most profitable uniform price is $p^* = \frac{1}{2}$. One can check from (17) that the optimal pricing strategy is

$$p_H = \frac{\sqrt{\lambda_B + 1} + 3}{8 - \lambda_B} \ ; \ p_L = \frac{p_H}{\sqrt{\lambda_B + 1}} \ ; \ \alpha = \frac{\sqrt{\lambda_B + 1} - 1}{\lambda_B} \ . \ (18)$$

This policy satisfies $p_H > p^* = \frac{1}{2} > p_L$, so that the high price is above, and the low price is below, the optimal uniform price $p^* = \frac{1}{2}$. This solution requires $\lambda_B$ to lie in the range $0 < \lambda_B < 3$ to satisfy (16). The policy converges to the optimal uniform price as $\lambda_B$ becomes small. When $\lambda_B = 1$ the approximately optimal policy involves $p_L = 0.44$ and $p_H = 0.63$, and the full price is offered to 41% of consumers. Note that the average price here ($\bar{p} \approx 0.52$) is higher than it would be if the firm charged a uniform price (for instance, because consumers did not exhibit reference dependence, so $\lambda_B = 0$).[15] The

---

[15]Spiegler (2011a, section 9.1.2) shows that in a model where loss-aversion is the dominant force average price falls relative to the standard case.

firm's profit with this policy is about 0.26 and aggregate consumer surplus, taking their reference-dependent preferences at face value, is 0.15.

There are at least two ways to relax the strong assumption that consumers observe the firm's full pricing policy, and instead observe only the price they themselves are offered. First, savvy consumers could hold equilibrium beliefs about the average price; second, consumers might be more gullible and believe the firm's claims about its average price.[16]

Consider first the situation where consumers hold equilibrium beliefs about the firm's entire pricing strategy, even though they observe only their own price. That is to say, from a consumer's viewpoint, the firm's prices to other consumers are "secret". If all consumers believe the average price is $P$, the firm's expected profit when it offers price $p$ to a given consumer is $(p - c)(1 - F(p - \lambda_B(P - p)))$ if $p \leq P$ and $(p - c)(1 - F(p + \lambda_R(p - P)))$ otherwise.[17] Thus, when (15) holds the firm faces a demand curve with an "inward" kink at the reference price $P$. In this case we have the following result.[18]

**Lemma 6** *Suppose consumers observe only their own price, and that the demand curve* $1 - F(\cdot)$ *is logconcave.*[19] *If (15) holds then (i) there is no equilibrium in which the firm offers a uniform price, and (ii) there exists an equilibrium in which the firm offers exactly two prices,* $p_L$ *and* $p_H$*, where both of these prices are below the most profitable uniform price* $p^*$*.*

**Proof.** (i) If to the contrary $P$ is an equilibrium uniform price, anticipated by consumers, the firm cannot make greater profit by choosing $p < P$, so that

$$1 - F(P) - (1 + \lambda_B)(P - c) f(P) \geq 0 ,$$

and neither can the firm make greater profit by choosing $p > P$, so that

$$1 - F(P) - (1 + \lambda_R)(P - c) f(P) \leq 0 .$$

These two inequalities are inconsistent if (15) holds.

---

[16] In this paper we assume that the firm either makes all its prices public or none. An interesting variant is to suppose that the firm can selectively reveal is price policy to consumers, in which case it might reveal the average price to those consumers who get a bargain, but keep those who pay a high price in the dark.

[17] Here, we assume consumers have "passive beliefs" about the average price, and the price $p$ a consumer is offered does not alter her anticipated $P$.

[18] In formal terms, this result resembles the analysis in Zhou (2011). Like us, he finds that a seller faces demand with an inward kink and chooses prices according to a mixed strategy with exactly two prices; in his case, the prominent seller uses "sales" to influence a loss-averse consumer's reference point when she evaluates the rival offer, while our firm uses "sales" to satisfy a consumer's demand for bargains.

[19] If $1 - F$ is weakly concave it is also logconcave.

(ii) We construct the "high-low" equilibrium as follows. Let consumers anticipate the average price $P$. If the firm chooses a price strictly above $P$, this price $p_H$ must (locally) maximize $(p - c)(1 - F(p + \lambda_R(p - P)))$, and when demand is logconcave there is at most one such price, which is determined for given $P$ by the first-order condition

$$p_H = c + \frac{1 - F(p_H + \lambda_R(p_H - P))}{(1 + \lambda_R)f(p_H + \lambda_R(p_H - P))} \ . \tag{19}$$

Likewise, if the firm chooses a bargain price below $P$, this price $p_L$ must maximize $(p - c)(1 - F(p - \lambda_B(P - p)))$, which is uniquely determined for given $P$ by the first-order condition

$$p_L = c + \frac{1 - F(p_L - \lambda(P - p_L))}{(1 + \lambda_B)f(p_L - \lambda(P - p_L))} \ . \tag{20}$$

The firm must be indifferent between choosing the two prices $p_L$ and $p_H$, so that

$$(p_L - c)(1 - F(p_L - \lambda_B(P - p_L))) = (p_H - c)(1 - F(p_H + \lambda_R(p_H - P))) \ . \tag{21}$$

Finally, in equilibrium consumer expectations of the average price are fulfilled, so that

$$P = \alpha p_H + (1 - \alpha) p_L \tag{22}$$

where $\alpha$ is the fraction of consumers who pay $p_H$. The four tariff parameters $p_L$, $p_H$, $P$ and $\alpha$ then solve the four equations (19)–(22).

To see that a solution to these four equations exists, argue as follows. First note that if we can find $p_L$, $p_H$ and $P$ satisfying (19)–(21) such that $p_L < P < p_H$, then we can find an $0 < \alpha < 1$ which satisfies (22). Therefore, we look for $p_L$, $p_H$ and $P$ satisfying (19)–(21) such that $p_L < P < p_H$. Since $1 - F(\cdot)$ is logconcave, we can check that $p_H$ in (19) is above $P$ if and only if $P$ is sufficiently small, and the threshold $P$ which makes the firm choose $p_H = P$ in (19) is

$$P_H = c + \frac{1}{1 + \lambda_R} \cdot \frac{1 - F(P_H)}{f(P_H)} \ .$$

Likewise, from (20) we can see that $p_L$ is below $P$ when $P$ is sufficiently large, and the threshold $P$ which makes the firm choose $p_L = P$ in (20) is

$$P_L = c + \frac{1}{1 + \lambda_B} \cdot \frac{1 - F(P_L)}{f(P_L)} \ .$$

Given the logconcavity of $1 - F$ and assumption (15), it follows that $P_L < P_H$. Thus, for any $P$ in the range $P_L < P < P_H$, the firm's high price in (19) is above $P$ and the firm's discounted price in (20) is below $P$. Note that both $P_L$ and $P_H$ are below $p^*$, the optimal uniform price.

22

It remains to show that we can find $P$ in the range $P_L < P < P_H$ such that (21) holds. Consider the lower boundary $P = P_L$. By construction, when $P = P_L$ then $p_L = P_L$ in (20) in which case the firm's profit when it chooses $p = p_L$ is $(P_L - c)(1 - F(P_L))$. But when $P = P_L$, the firm's profit when it chooses $p_H$ in (19) is strictly higher than this, since the firm could have chosen $p_H = P_L$ which yields the same profit $(P_L - c)(1 - F(P_L))$. Thus, when $P = P_L$ the firm makes strictly greater profits by choosing $p_H$ in 19) than it does by choosing $p_L$ in (20). A similar argument establishes that when $P = P_H$, the firm does strictly better by choosing the lower price $p_L$ in (20) than by choosing $p_H$ in (19). By continuity, there exists at least one $P$ in the range $P_L < P < P_H$ where the firm is indifferent between choosing $p_L$ in (20) and $p_H$ in (19). This completes the proof. ∎

In the same example where $v$ is uniform on $[0, 1]$, $c = 0$ and $\lambda_R = 0$, the equilibrium pricing policy in the regime where consumers observe only their own price can be shown from expressions (19)–(22) to be

$$p_H = p^* = \frac{1}{2} \; ; \; p_L = \frac{p_H}{\sqrt{\lambda_B + 1}} \; ; \; \alpha = P = \frac{\sqrt{\lambda_B + 1} - 1}{\lambda_B} \; . \qquad (23)$$

Note that the high price in this example is equal to the optimal uniform price, and from (19) this is true whenever $\lambda_R = 0$ so that consumers do not care when they pay an above-average price. When $\lambda_B = 1$, the firm's profit as a function of its price $p$ offered to any particular consumer, given that the consumer believes average price is $P = \sqrt{2} - 1$, looks as shown on Figure 1. This figure illustrates the bimodal nature of profit with bargain-loving consumers, and the equilibrium is constructed so that the height of the two peaks coincides.



Figure 1: Monopolist's profit as function of $p$

This price policy in (23) is qualitatively the same as in the case in (18) where a consumer can observe the firm's prices for all consumers; in particular the percentage discount $p_L/p_H$

is the same and the likelihood of getting a bargain is the same. However, prices are now shifted downwards. Of course, quite generally, the firm's profits here are lower compared to when consumers see the full range of prices, since the firm could choose the pricing policy seen with secret deals as its policy when its prices are public. In this linear demand example, aggregate consumer surplus is now higher, at about 0.2, and total welfare is higher when the firm's prices are privately observed. Intuitively, when the firm makes secret deals with each consumer, the firm has a greater incentive to undercut the average price since other consumers do not observe, and cannot react to, the price cut.[20]

Suppose that the firm is able to make false claims about its average price. If consumers are savvy, they foresee that the firm has an incentive to exaggerate its average price to boost its demand from bargain-loving consumers, and so consumers discount its claims and behave as if they cannot observe the average price. In such a situation, a policy which enables the firm credibly to reveal its average price will help the firm and, at least in the linear demand example, *harm* consumers. If policy forces the firm to publish accurate information about its prices and the proportion of prices which are discounted, then any price-cut targeted at particular individuals reduces demand from other consumers, and so blunts the firm's incentive to discount.[21]

On the other hand, if consumers are more gullible and believe its claims, the firm's profits are increased when it is able to make misleading claims. It can then obtain the benefit of boosting demand from perceived "bargains" without the cost of sometimes having to set inefficiently high prices. It would like to claim average price was as high as possible, so that it could then set high actual prices without cutting demand.[22]

Summarizing our discussion of this model, we have:

**Proposition 3** *(a) Suppose consumers have an intrinsic preference for bargains. Then the monopolist will offer distinct prices to identical consumers. If demand $1 - F(p)$ is weakly concave, the firm will adopt a "high-low" pricing strategy and offer exactly two prices to the population of consumers. The firm's profit is higher when consumers can observe its average price compared to when they have no information about its average price.*

---

[20]The effect is analogous to the "secret deals" problem in vertical contracting, discussed in Rey and Tirole (2007), in which an upstream manufacturer who sells to two competing retailers has an opportunistic incentive to boost supply to a retailer when the other does not observe the deal.

[21]Again, this is similar to the impact of policy on the secret deals problem in vertical contacting, where a requirement to make the supplier's deal to one retailer observed by another will boost supplier profits and harm final consumers.

[22]In this case, the welfare impact of a policy banning false discounts is more complicated, and depends on how one views a consumer's utility from getting a "false bargain".

*(b) Suppose demand is linear. A policy which prevents the firm from making false claims
about its average price helps the firm and harms consumers and welfare if consumers are
savvy and foresee the firm will exaggerate its average price. The same policy will harm the
firm if consumers are gullible and believe its claims about average price.*

# 5  Conclusion

This paper has explored some economic effects of discount pricing. We suggest two reasons
why a discounted price—as opposed to a merely low price—may make a rational consumer
more willing to buy. First, the information that the product was initially sold at a high price
may indicate the product is high quality. Second, a discounted price can indicate that the
product is an unusual bargain, and that there is little point searching for alternative, lower
prices. We also discuss discount pricing with behavioural consumers. If consumers have an
intrinsic preference for bargains, a seller has an incentive to offer different prices to identical
consumers, so that a proportion of its consumers will enjoy a bargain. Information about
discounts in this case assures consumers how good their deal is relative to the average,
which boosts their willingness to purchase.

Because of their incentive to mislead customers, in some—but not all—of the situations
we discuss, there is a potential role for policy to prevent sellers advertising false discounts.
In all models, if consumers are gullible and believe—rather than merely ignore—a firm's
false claims, such a policy will help consumers and harm the firm. In most cases, the overall
impact on welfare of a policy which combats false discounting is positive.[23] If consumers
are savvier, matters are more nuanced. In our model where the initial price serves to signal
the choice of high quality, a ban on misleading claims will actually benefit the firm, as it
makes it easier to signal its quality. In the model with oligopoly search, such a policy
benefits consumers as they then learn when an offered price is a discounted price and can
reduce their search effort. Finally, in our model of bargain-lovers, when consumers are
savvy a ban on misleading price claims will help the firm but *harm* consumers. Policy
which helps the firm make public its pricing policy overcomes its "secret deals" problem,
to the detriment of consumers.

In any case, the potential benefit from regulatory policy can be realized only if it is
effectively enforced. Indeed, weakly enforced policy may be worse than no policy: it may
make consumers gullible and act on a firm's false discounts, and it may harm honest sellers

---

[23]The exception is the model of oligopoly search in section 3, where permanent sale signs induce gullible
consumers to buy more often from their local seller, which reduces search costs.

who follow the letter of policy. As discussed by Muris (1991) and Rubin (2008), it is hard to enforce, or perhaps even coherently to formulate, policy towards misleading pricing. A basic problem is how to determine how few sales need to occur at the full price, or for how short a time the full price is available, for a sales campaign stating "was $200, now $100" to be classified as misleading. Sellers have a strong motive to make their customers feel they are getting a special deal, and they have myriad ways to achieve this. It is unrealistic and undesirable to suppose that regulation can address all forms of false discounting without unduly restricting a seller's marketing abilities, and regulators should focus only on flagrant examples of deception.

## References

Bagwell, Kyle and Michael Riordan (1991), "High and Declining Prices Signal Product Quality", *American Economic Review* 81(1), 224-239.

Bordalo, Pedro, Nicola Gennaioli and Andrei Shleifer (2012), "Salience and Consumer Choice", NBER working paper 17947.

Cialdini, Robert (2001), *Influence: Science and Practice*, Allyn and Bacon (4th Edition).

Heidhues, Paul and Botond Kőszegi (2005), "The Impact of Consumer Loss Aversion on Pricing", CEPR discussion paper no. 4849.

Jahedi, Salar (2011), "A Taste for Bargains", mimeo, University of Arkansas.

Lazear, Edward (1986), "Retail Pricing and Clearance Sales", *American Economic Review* 76(1), 14–32.

Muris, Timothy (1991), "Economics and Consumer Protection", *Antitrust Law Journal* 60, 103-121.

Puppe, Clemenz and Stephanie Rosenkranz (2011), "Why Suggest non-binding Retail Prices?", *Economica* 78, 371-329.

Rey, Patrick and Jean Tirole (2007), "A Primer on Foreclosure", chapter 33 in *Handbook of Industrial Organization vol. 3*, edited by Armstrong and Porter, Amsterdam: North-Holland.

Rubin, Paul (2008), "Regulation of Information and Advertising", *Competition Policy International* 4(1), 169–192.

Spiegler, Ran (2011a), *Bounded Rationality and Industrial Organization*, Oxford University Press.

Spiegler, Ran (2011b), "Monopoly Pricing when Consumers are Antagonized by Unexpected Price Increases: A 'Cover Version' of the Heidhues-Koszegi-Rabin Model", *Economic Theory* (forthcoming).

Thaler, Richard (1985), "Mental Accounting and Consumer Choice", *Marketing Science* 4(3), 199-214.

Tirole, Jean (1988), *The Theory of Industrial Organization*, MIT Press.

Urbany, Joel, William Bearden and Dan Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search", *Journal of Consumer Research* 15(1), 95-110.

Zhou, Jidong (2011), "Reference Dependence and Market Competition", *Journal of Economics and Management Strategy* 20(4), 1073-1097.

# EXHIBIT 110



## AMERICAN MARKETING ASSOCIATION

Comparative Price Advertising: Informative or Deceptive?
Author(s): Dhruv Grewal and  Larry D. Compeau
Source: *Journal of Public Policy & Marketing*, Vol. 11, No. 1 (Spring, 1992), pp. 52–62
Published by: American Marketing Association
Stable URL: http://www.jstor.org/stable/30000025
Accessed: 24-05-2018 00:48 UTC

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://about.jstor.org/terms



*American Marketing Association* is collaborating with JSTOR to digitize, preserve and extend access to *Journal of Public Policy & Marketing*

## JSTOR

# Comparative Price Advertising: Informative or Deceptive?

## Dhruv Grewal and Larry D. Compeau

*An issue currently generating considerable debate is the increasing use of the comparative price format in advertising. In this paper, reviews of comparative price advertising literature and Federal Trade Commission (FTC) guidelines are integrated to discuss whether comparative price advertisements are informative or deceptive. Recent court cases relevant to comparative price advertising are also discussed. The central focus of the paper is to articulate the state of knowledge regarding comparative price advertising and to assess its potential for being informative or deceptive using an examination of relevant literature and public policy. Recommendations regarding comparative price advertising for public policy makers, managers, and researchers are developed.*

Considerable time and money is spent designing advertisements that will appeal to consumers. One particular format, *the comparative price advertisement*, appeals to consumers' desire for bargains or deals. In comparative price advertisements, advertisers attempt to get consumers to compare a "sale price" to a suggested reference price. This may be an explicit reference price comparison (e.g., "original price/sale price" or "their price/our price") or an implicit reference price comparison (e.g., the use of "sale price" alone suggests that the regular price is higher).

Ostensibly, advertisers give consumers more price information in a comparative price advertisement than in a noncomparative price advertisement. Comparative price advertising offers consumers a basis for comparing the relative value of the product offering by suggesting a monetary worth for the product and any potential savings. For example, the comparative price advertisement, "regular price $10.00, on sale $7.99," suggests a monetary worth of $10.00 and a savings of $2.01. To the extent that consumers do not have this information about potential savings, the comparative price advertisement is beneficial because more informed consumers are likely to make better purchase decisions.

However, comparative price advertising need not always be beneficial. The FTC has promulgated specific guidelines to determine the conditions under which a comparative price advertisement is deceptive. In general, a comparative price advertisement can be construed as deceptive if it makes any representation, commits any omission of information, or involves any practice that may materially mislead a reasonable consumer [Della Bitta et al. 1981; Ford and Cal-

fee 1986; Kinnear and Root 1988; Laczniak and Grossbart 1990; Richards 1990a].

Recently, numerous legal actions have been taken against major retailers regarding the use of comparative price advertisements [Grewal and Grewal 1991]. The State of Maryland charged that the May Department Stores employed deceptive comparative price advertising. Specifically, it was alleged that May's reference price, labeled as a regular price, was deceptive since May had not regularly sold the product at that price [Grewal and Grewal 1991]. Deception can also occur through the omission of information. Blair and Landon [1981] found that omitting a reference price in conjunction with labeling a price as a "sale price" led consumers to infer a savings. Thus, if the savings inferred were greater than the actual difference between the nonsale price and the sale price, the advertisement was deceptive.

Comparative price advertising should be distinguished from comparative advertising. In comparative advertising, the advertiser typically compares his/her product to a competitor's product (named or implied) [Hisrich 1983; Muehling and Kangun 1985; Turgeon and Barnaby 1988; Wilkie and Farris 1975; Wilson 1978]. This comparison may be an attribute-specific comparison or a global comparison. Therefore, it is tempting to conclude that comparative price advertising is a specific case of the more general comparative advertising. However, the advertiser in a comparative price advertisement compares an actual selling price to some "other" price. This "other" price may not be the price of the competitor (e.g., "manufacturer suggested list price" or a "regular price"). Only in an instance where an advertiser compares a price offer to that of a competitor could a comparative price advertisement be considered a comparative advertisement. Since this paper focuses on comparative price advertising, the general topic of comparative advertising is considered to be outside its scope.

The contributions of two streams of research—comparative price advertising and information cues—facilitate understanding the informative or deceptive nature of comparative price advertisements. An understanding of the effects of information cues on consumer decision processes is considered vitally important by the FTC [Ford and Calfee 1983].

DHRUV GREWAL is with the Department of Marketing at the University of Miami, Coral Gables, Florida. LARRY D. COMPEAU is with the Department of Marketing at Clarkson University, Potsdam, New York. Both authors contributed equally to the paper. The helpful comments of KENT B. MONROE, JERRY B. GOTLIEB, DIANA S. GREWAL, four anonymous reviewers, and the editor are greatly appreciated. DHRUV GREWAL was partly funded by a Summer Award in Business and Social Sciences at the University of Miami.

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

In the comparative price advertising stream, consumer researchers have examined the effects of the use of explicit reference prices in terms of their ability to deceive [Blair and Landon 1981; Liefeld and Heslop 1985; Sewall and Goldstein 1979]. The stream of information cue research has examined consumers' use of price as an information cue [Rao and Monroe 1989]. However, this research is fragmented, so to derive substantive public policy implications from these studies, a comprehensive review follows.

The next section discusses the FTC's guidelines for pricing practices. Moreover, representative court cases concerned with alleged deceptive price advertising are presented to illustrate relevant legal issues. A conceptual framework is then presented. The third section uses this conceptual framework to guide the review of the research and ties the behavioral research to legal issues. In the fourth section, recommendations for public policy makers, managers, and researchers are given. Finally, key aspects of this paper are summarized.

# Legal Policies

In order for consumer research to be relevant for public policy, researchers must be better acquainted with the law [Preston 1976; Richards 1990a]. This section discusses the FTC's relevant guidelines and a few recent court cases.

## FTC Guidelines

To prevent deceptive practices, the FTC specifies guidelines for pricing practices. Part-233 (Section 233.1- 233.5) of the Code of Federal Regulations contains guidelines against deceptive pricing. Some key points of these guidelines are reviewed briefly:

### Section 233.1: Former Price Comparisons

A common practice is to offer a product at a reduced price relative to the advertiser's own former price (e.g., original price/sale price). A bargain is genuine if:

a. the former price is the "actual bona fide" previous price;

b. for which the product "regularly sold;"

c. for a "reasonably substantial" period of time; and

d. the offer is made in the regular course of business and in good faith.

Furthermore, if the former price or reduction (amount or percentage) is not stated in the advertisement, as in one that simply states "sale," the advertiser must make sure that the reduction is not so insignificant as to be meaningless (e.g., original price $10, now being advertised as "on sale for $9.99"). It is this section that is the focus of most of the recent legal cases dealing with comparative price advertising violations.

### Section 233.2: Retail Price Comparisons; Comparable Value Comparisons

Another common practice is comparing the advertiser's selling price to a competitor's higher price; for example, "Product-x; their price $10, our price $7.50." This strategy is known as a retail price comparison. In order for the offer to be genuine, the following criteria must be met:

a. the advertised higher price must be based on facts and not fictitious and misleading; and

b. the advertised higher price must not exceed the price at which substantial sales are made in the area.

Likewise, another practice compares the advertiser's price to some higher price being charged for similar, but not identical merchandise. The guidelines for preventing deception for this practice are:

a. it must be made clear that the comparisons are being made to other merchandise;

b. the other merchandise is of like grade and quality; and

c. the advertised higher price does not exceed the price at which the merchandise is offered by representative retail outlets in the area.

### Section 233.3: Advertised Retail Prices Suggested by Manufacturers

Many times advertisers compare their sale price to a higher manufacturer's suggested list price (MSLP). This strategy has the potential for deception unless:

a. substantial sales are made in the area at the suggested retail price; and

b. the manufacturer or retailer acts honestly and in good faith in advertising the list price and not with the idea of creating a deceptive comparison.

### Section 233.4: Bargain Offers Based Upon Purchase of Other Merchandise

Advertisers regularly create bargains by offering additional merchandise with the initial purchase (e.g., "buy one-get one free"). Although this section is somewhat tangential to the central focus of the paper, such offers are implicitly comparing the sale price to a reference price. For example, prior to the holiday season a number of airlines were advertising "buy one ticket and get another one free," suggesting a 50 percent discount. Consumers are protected when advertisers adhere to the following guidelines:

a. the selling price must not be inflated;

b. the quality of the product must not be reduced;

c. the quantity of the product must not be reduced;

d. no additional conditions should be attached (other than the basic condition that the article be purchased to get the additional merchandise); and

e. all terms and conditions of the offer must be made clear.

### Section 233.5: Miscellaneous Price Comparisons

There are a number of variations in comparative price advertisements which also have the potential for deception. Retailers, for instance, should not represent a retail price as being a "wholesale" price when they are not selling at the price paid by purchasing directly from the manufacturer. Retailers should not sell imperfect merchandise as reduced (i.e., marking down "irregulars") without disclosing that it is imperfect. Retailers should not offer advance sales under conditions where they do not, in good faith, expect to increase the price at a later date. In all cases of bargain offers, the advertiser must ensure that the bargain being offered is genuine and truthful. According to the FTC, these guidelines pro-

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

vide the most effective ways for advertisers to operate in the best interests of the public.

## Recent Comparative Price Cases

Recently there have been several court cases concerning the use of deceptive comparative pricing practices by major retailers, including *State of New York vs. Sears, Roebuck & Co., State of Colorado vs. May Department Stores Inc., State of Maryland vs. The Hecht Co., State of New York vs. Stigley, and New York City's Department of Consumer Affairs vs. Newmark and Lewis Inc.* [Agins 1990; Grewal and Grewal 1991; Monroe 1990]. These cases have brought attention to the potential widespread misuse of comparative price advertising.

The *State of New York vs. Sears, Roebuck & Company* is a representative case that can be used to illustrate some of the issues involved in comparative price advertising. The New York State Attorney General alleges that Sears breached a 1986 agreement to discontinue the use of misleading and deceptive sales practices, the most prominent of which were comparative price advertisements. It was charged that Sears "urged consumers into believing they were being offered bargains ... by promoting products with inflated fictitious "regular" prices." Specifically, the complaint charged that Sears used deceptive pricing in violation of several laws and the FTC's Code of Federal Regulations. In accordance with these charges, the attorney general sought redress in the form of consumer restitution, among other penalties, to compensate those customers who purchased products when they otherwise might not have because they "believed them to be bargains."

States are becoming more aggressive concerning violations of consumer protection laws, as illustrated by the *State of New York vs. Sibley, Lindsay & Curr Co.* (Sibley's). The attorney general alleged that Sibley's, from 1987 to 1989, had advertised television sets, videocassette recorders, stereos, dinnerware, furniture, and mattresses on sale at various percentages off "regular prices." These discount percentages ranged as high as 50 percent off the purported "regular prices." The attorney general alleged that the regular prices quoted were fictitious, with no actual basis for use in comparison to "sale" prices, because a number of the products had never sold at those prices and in some cases had never even been offered for sale at these "purported regular prices." This action by Sibley's violated a 1984 Assurance of Discontinuance agreement which had been accompanied by a $4,000 fine. Sibley's has entered another Assurance of Discontinuance, but the fine has been increased to $225,000. This legal action suggests a much less tolerant view of such practices. Similarly, in the case of *State of Maryland vs. The Hecht Co.,* Hecht signed an Assurance of Discontinuance agreement that was accompanied by a $500,000 fine.

In the case of *City of New York vs. Newmark & Lewis, Inc.,* the Commissioner of the Department of Consumer Affairs for the City of New York alleged that Newmark & Lewis advertised that it had lowered its prices on every product in the store, when in fact some prices had not been changed. In August 1989, Newmark & Lewis was served notice that it failed to lower the prices on fifty products in vi-olation of the consumer protection law. Thus, by claiming that it had "lowered every price on every item even further," Newmark & Lewis was misleading consumers by using implicit price comparisons and giving the impression that exceptional deals were available. Similar cases alleging violations of the FTC's deceptive pricing guidelines (or individual state guidelines) are being looked at in other states where the primary issue is whether the reference price utilized in the comparative price advertisement is genuine or fictitious (for a review of the FTC, see Baer 1988; Jones 1988; Strenio 1988).

In the next section, a conceptual model is presented which guides the subsequent review of the comparative price advertising research. The model illustrates the effects of information cues on consumers' product evaluations so as to better understand how price information in a comparative price advertisement is used by consumers. This research has taken on greater importance since the FTC has shifted its reliance from its own experts to consumer testimony and surveys [Brandt and Preston 1977; Richards 1990a].

## Conceptual Model

Knowledge of the way that consumers use price as information is basic to understanding how comparative price advertising can be informative or deceptive. Therefore, a conceptual framework is provided that explains the effects of comparative price advertising on consumers' product evaluations and purchase and search behaviors. This model incorporates the substantive results of research that examines the use of price as information, namely the price-perceived quality stream of research.

Substantive results from the price-perceived quality research stream suggest that price has both an information component and a sacrifice component [Chapman 1987]. Consumers use price as a cue for two types of information. Price information identifies the monetary sacrifice the consumer has to make to acquire the product (perceptions of the amount of money that must be given up) [Chapman 1987]. Price is also used as an indicator of product quality (empirically supported by two recent meta-analyses: Monroe and Krishnan 1985; Rao and Monroe 1989). Therefore, price is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price. Consumers' use of price in a comparative price advertisement may be informative or deceptive, depending on (1) the price used by the consumer to make quality judgments (the reference price, the actual price, or both) and (2) whether the prices are bona fide.

If the reference price is truthful and consumers make product quality inferences based only on the reference price, then no deception has occurred and the comparative price advertisement has been informative. If the reference price is truthful, but the consumer bases product quality inferences on the sale price, the consumer has not been deceived; however, the lower perception of product quality could be detrimental to the advertiser because it may reduce brand equity [Sawyer and Dickson 1984]. If the reference price is exaggerated and the consumer infers product quality based on

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

this reference price, then there has been deception (i.e., the consumer has been materially misled by the exaggerated reference price). Finally, if the reference price is exaggerated and even if the consumer infers product quality based on the sale price, the legal definition of deception has been met. However, the FTC or state attorney general's office may decide that the misrepresentation is not material and not prosecute the advertiser [Richards 1990a]. Thus, it is not always true that inflated reference prices will enhance consumer perceptions of value. Consumers may not believe the misrepresented reference price and therefore reject it and base their perceptions of value on the selling price. Moreover, if the reference price is judged by the consumer to be patently false, a negative reaction to the brand may further adversely reduce perceptions of value [Lichtenstein and Bearden 1986; Lichtenstein et al. 1989].

A conceptual framework is provided in Figure 1 that simplifies existing models [Dodds, Monroe, and Grewal 1991; Grewal and Monroe 1991; Monroe and Chapman 1987; Stigler 1961; Thaler 1985; Zeithaml 1988] and guides the comparative price advertising literature review. According to the model, semantic cues, that is, phrases used in an advertisement that describe a price or a price offer (e.g., MSLP, sale price, compare at), provide the consumer with information about a reference price, selling price, and potential savings. This information is used to develop perceptions of the product's quality relative to its actual cost to the consumer. For example, the semantic cue "regular price, sale price" suggests to the consumer that a product with quality comparable to the "regular price" is being offered for sale at the lower "sale price" and is therefore a better deal.

According to the model, external reference prices suggested by advertisers influence consumers' perceptions of quality [Monroe and Chapman 1987]; moreover, external reference prices can also cause internal reference prices to shift toward the advertised reference price [Lichtenstein and Bearden 1988, 1989; Urbany et al. 1988)]. An internal reference price is a price held in consumers' memory and is used for comparison with other prices [Grewal and Monroe 1991; Kamen and Toman 1970]; it may be a specific value or a range of values [Monroe 1971], including price last paid, expected price, and estimated market price [Klein and Oglethorpe 1987]. Moreover, the consumer's internal reference price may shift toward the external reference price supplied in the advertisement, regardless of its veracity [Urbany et al. 1988]. That is, even exaggerated reference prices that consumers do not believe may enhance value perceptions.

Consumers' *perceptions of value* are positively influenced by both their perceptions of quality and their internal reference price [Grewal and Monroe 1991; Thaler 1985]. Consumers' perceptions of value are influenced by the trade-off between what they get relative to what they must give up [Zeithaml 1988]. Simply put, consumers value products perceived as high quality that are available at low prices. Furthermore, the lower the selling price relative to the internal reference price, the larger the perceived value. In other words, consumers attach value to saving money.

These perceptions of value influence *purchase behavior* [Szybillo and Jacoby 1974; Zeithaml 1988] and *price search behavior* [Grewal and Monroe 1991]. Specifically, the higher the overall perception of value the greater the willingness to buy and the lower the likelihood of additional price search.

This model then articulates how consumers use price information and consequently suggests how deception occurs in comparative price advertisements. A comparative price advertisement contains information about the product's reference price, selling price, and potential savings. If the advertisement conveys an inflated reference price, it could enhance a consumer's perception of quality and his/her internal reference price. Therefore, it would enhance the consumer's perceptions of value and willingness to buy the product. Search for a better price would be likely to be reduced or terminated. The behavioral research and the conceptual model suggest that a comparative price advertisement has the opportunity to inform or deceive through its ability to influence consumers' perceptions of quality and value, internal reference prices, and hence, purchase and search behavior.

## Comparative Price Advertising Research

A comprehensive review of the literature was undertaken to identify comparative price advertising studies. This review consisted of the use of periodical indices, computerized data base searches, the "invisible college" technique (i.e., colleagues working in this research area provided references, full bibliographies, and copies of studies) [Cooper 1984], and the ancestry method (i.e., tracking material that has been cited in research that was already collected in a recursive manner). The search process identified forty-six studies, of which only twenty-eight are reviewed here, because they contained empirical results. The discussion of this research will focus on the explicit public policy implications drawn from the studies.

Although the research area suffers from a general lack of robust conceptual definitions and certain methodological flaws [Compeau and Grewal 1990], several substantive conclusions having public policy implications can be drawn from the literature (Table 1). Four key public policy implications of these studies are discussed:

- the effects of the presence of a reference price in an advertisement;
- the effects of the magnitude of discount;
- the effects of semantic cues/price promotional phrases; and
- the effects of manufacturer's suggested list price.

### Presence of Reference Price in an Advertisement

An examination of the substantive results of the research suggests that an advertisement containing a reference price and a sale price is more effective in influencing consumer perceptions of price and value than an advertisement containing only a sale price. By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product [Barnes 1975; Bearden et al. 1984; Della Bitta et al. 1981; Friedman

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms



**Figure 1.   The Conceptual Model**



Note: This model is adapted from Monroe and Chapman [1987] and Grewal and Monroe [1991].

et al. 1982; Inman et al. 1990; Keiser and Krum 1976; Urbany et al. 1988; Varadarajan 1986]. Thus, if the reference price is truthful, the advertisement offers valuable price information to the consumer.

If the reference price is not truthful, a consumer may be encouraged to purchase as a result of a false sense of value. In this situation the advertisement is no longer informative but deceptive. Therefore, a selling price labeled as a "sale price" alone, while offering less information, may actually result in a more informed decision compared to a deceptive comparative price advertisement, since consumers base their perceptions of the product on the characteristics of the product itself and on the actual selling price rather than on a fictitious reference price. It must be noted that research results of Lichtenstein and Bearden [1989] indicate that, for deep discounts from an implausible reference price, there could be a potential reduction in consumers' perceptions of value. In addition, Moore and Olshavsky [1989] found that fewer subjects choose an unfamiliar brand with a deep discount relative to a moderate discount.

However, a selling price labeled as a "sale price" alone may still convey a message of savings or additional value to consumers [Blair and Landon 1981]. If consumers use the reference price provided in the advertisement to infer judgments about the product, their perceptions of the value associated with the product will be enhanced (i.e., acquisition value). However, simply labeling a price as a "sale price" also appears to convey a perception of savings and may enhance perceptions of value. Therefore, the opportunity for deception exists if the retailer provides an exaggerated reference price or simply labels a price as a "sale price" when the "sale price" is not significantly lower than the previous price, misrepresenting the value and materially misleading the consumer. This practice may result in higher perceptions of quality and value, along with a reduction in search and an increase in the likelihood of purchase.

### Magnitude of Discount Size/Savings

The results of the empirical studies indicate that as discount size increases, consumers' perceptions of value and their willingness to buy the product increase, while their intention to search for a lower price decreases [Berkowitz and Walton 1980; Burton and Lichtenstein 1988; Chapman 1987; Della Bitta et al. 1981; Friedman et al. 1982; Fry and McDougall 1974; Lichtenstein and Bearden 1989; Lichtenstein et al. 1989; Mobley et al. 1988; Moore and Olshavsky 1989; Oglesby 1984; Raju and Hastak 1983]. The research results indicate that false or inflated reference prices mislead the consumer and reduce search as a result of these larger discount sizes [Keiser and Krum 1976; Urbany et al. 1988]. Consequently, there is an incentive for advertisers to use inflated reference prices and/or to actually reduce the selling price. The latter approach maintains an informative advertisement, while the former renders the advertisement deceptive.

### Effects of Semantic Cues or Price Promotional Phrases

Price promotional phrases and semantic cues that provide more information (e.g., an advertisement with "regular price/sale price" provides more information than an advertisement with "sale price" only) enhance the believability and perceived value of the price-promotional offer [Barnes 1975]. Although the amount of savings in the price-promotion is the same, the use of different semantic cues or price-promotion cues (e.g., a product advertised for "$.99, 50% off regular price" versus product advertised for "$.99, 1/2 off regular price") affects consumers' perceptions of the informativeness of the advertisement and their purchase behavior [Diamond and Sanyal 1990; Oglesby 1984; Varadarajan 1986].

Objective claims, such as "save 50%," are perceived to provide greater information than subjective claims like "save up to 50%" [Mobley et al. 1988]. Objective claims

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

Case 2:16-cv-03791-JGB-SP   Document 97-3   Filed 05/30/18   Page 55 of 96   Page ID
#:3454

**Table 1.**     **Review of Comparative Price Advertising Research Results**

| Study | Research Results |
|---|---|
| Fry and McDougall (1974) | • Low acceptance of advertised reference price (RP).<br>• Magnitude of discount lowers consumers' search for the lowest price. |
| Barnes (1975) | • Increase in price promotional information (i.e., high: RP/SP and low: sale/SP)enhances believability of the price-offer.<br>• Increase in price promotional information enhances perceived value of the price-offer. |
| Keiser and Krum (1976) | • Advertisement with reference price/sales price (RP/SP) is more effective in creating impressions of price reduction than offer with just a SP.<br>• Fictitious reference price misleads consumers.<br>• Consumers do not question the truthfulness of the advertisement. |
| Sewall and Goldstein (1979) | • Few consumers misunderstand the meaning of catalog RP.<br>• Consumers oppose the prohibition of catalog RPs. |
| Berkowitz and Walton (1980) | • Discount size influences consumers' price perceptions.<br>• Semantic cues influence consumers' price perceptions.<br>• Contextual cues may warrant attention in terms of their deceptive possibility. |
| Blair and Landon (1981) | • False RPs have the capacity of deceiving, but this deception is not guaranteed.<br>• Reference prices inflate consumer perceptions of savings, but the perceived savings is less than the difference between the RP and the SP. |
| Della Bitta et al. (1981) | • Magnitude of discount enhances consumer perceptions of value.<br>• Magnitude of discount lowers consumer search intentions.<br>• Magnitude of discount enhances interest in product/brand.<br>• Semantic cues affect consumer perceptions (cues with explicit RP are better than implicit RP). |
| Ahmed and Gulas (1982) | • Large number of the respondents associated manufacturer's suggested list price (MSLP) with price charged by majority of the stores in the area.<br>• Comparison of list price to store's SP can be misleading. |
| Friedman et al. (1982) | • Magnitude of discount enhances consumers' willingness to buy the product.<br>• Advertisements with RP/SP are more effective in increasing consumers' willingness to buy than an advertisement with a SP only. |
| Raju and Hastak (1983) | • Magnitude of deal enhances consumers' purchase intentions. |
| Oglesby (1984) | • Magnitude of discount enhances consumers' price attitudes.<br>• Semantic cues affect consumers' perceptions of price information. |
| Bearden et al. (1984) | • Advertisement with RP/SP was viewed more favorably than an advertisement with SP information only. |
| Liefeld and Heslop (1985) | • MSLP is not misleading.<br>• Presence of 'sale' increases consumer suspiciousness. |
| Varadarajan (1986) | • Semantic cues affect purchase behavior.<br>• Presence of RP/SP in advertisement enhanced purchase relative to ad with SP only. |
| Chapman (1987) | • Magnitude of discount enhances consumer perceptions of value. |
| Lichtenstein and Bearden (1988) | • External RP affects consumers' internal price standards and can be misleading. |
| Mobley et al. (1988) | • Magnitude of discount enhances consumer perceptions of value.<br>• Claim type affects consumer perceptions of information value of the advertisement (objective claims have greater information value than tensile/subjective claims).<br>• The level of consumer discounting of the advertisement message depends on the claim type. |
| Burton and Lichtenstein (1988) | • Magnitude of discount affects consumer attitudes of price deals. |
| Urbany et al. (1988) | • Advertisement with a plausible RP, as compared to an advertisement without a RP, enhances subject's internal RP and the perceived value of the product.<br>• Advertisement with an implausible RP had same effect, even for skeptics, and in addition reduces search for a lower price.<br>• These perceptions may affect search and choice. |
| Lichtenstein and Bearden (1989) | • Magnitude of discount enhances perceived value of the deal when the discount is from a plausible RP.<br>• The effect of magnitude of discount on consumers' perception of value decreases when the discount is from an implausible RP. |
| Lichtenstein et al. (1989) | • Magnitude of discount enhances perceived value of the deal. |
| Moore and Olshavsky (1989) | • Deep discount amount does not increase product choice for unfamiliar brands.<br>• Magnitude of discount enhances choice (except for deep discounts). |
| Diamond & Sanyal (1990) | • Semantic cues/price promotional framing as a gain enhances choice. |
| Gotlieb (1990) | • Greater savings enhance consumer involvement. |
| Gotlieb & Fitzgerald (1990) | • The greater the MSLP, the more the consumer is willing to pay. |
| Gotlieb and Swan (1990) | • Greater savings enhance consumer involvement and motivation to process information. |
| Inman et al. (1990) | • For low need for cognition consumers: A promotional signal (not accompanied by a price cut) affects choice.<br>• For high need for cognition consumers: Promotional signals are effective only when accompanied by a price cut. |
| Gotlieb & Sarel (1991) | • When the credibility of the source is high, the established brand's price, a RP, affects the quality perceptions of the new product. |

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

are precise statements, whereas subjective claims are vague. For example, "save 50%" is an objective claim because the consumers know they will save 50 percent off a supplied reference price. On the other hand, "save up to 50%" is a subjective claim, and consumers are unsure about savings. Thus, consumers are more skeptical of subjective claims and discount them to a greater extent than objective claims [Ford et al. 1990; Mobley et al. 1988]. Consequently, the way in which advertisers word their price claims influences consumers' perceptions and behavioral responses.

Different semantic labels for the reference price and the actual selling price may inform or deceive the consumer, depending on whether there is a shared interpretation of the labels for both the sellers and the consumers. If consumers and sellers interpret the semantic cues in the same way, then the potential for deception is small. However, if consumers and sellers interpret the semantic cues differently, then the potential for deception is great. For example, this can occur when a seller uses a vague word such as "special" to label an actual selling price. Consumers may interpret "special" as meaning the actual selling price is especially low for some reason and will stay at this price until all inventory has been sold. On the other hand, consumers may interpret "special" as implying a limited time offer. Thus, this impreciseness in interpreting the semantic cue allows a greater opportunity for deception. Richards [1990a, p. 30] has pointed out that, "courts have determined that if a statement in an ad lends itself to more than one interpretation by the ordinary recipient of the ad, and *one* of those interpretations is deceptive, the representation will be construed to be deceptive, *in toto.*" In addition, puffery, which is defined as claims that involve exaggeration, superlative, and hyperbole, has often been used by advertisers as a defense against allegations of deception [Honigwachs 1987], although if the claim materially misleads the consumer, it is deceptive and puffery is not a valid defense [Richards 1990b].

The informative and deceptive potential of semantic cues is directly dependent on the interpretation of consumers and sellers. The more vague the semantic cue, the greater the likelihood of differing interpretations and the chance that the meaning will not be shared. Consequently, there is a greater potential for deception. This utilization of vague semantic cues is contrary to the FTC's objective of enhancing factual comparisons.

### Effect of Manufacturer's Suggested List Price (MSLP)

The results concerning the effect of MSLP on consumers' perceptions are mixed. Liefeld and Heslop's [1985] findings indicate that the use of a MSLP is not misleading. Ahmed and Gulas [1982] found that a majority of the respondents associate the MSLP with the price charged by the majority of the stores; therefore, the MSLP may confuse consumers and lead them away from further price comparisons if it is not a price charged by the majority of stores. This latter finding is reinforced by Gotlieb and Fitzgerald [1990]—the higher the MSLP, the higher the price consumers are willing to pay—suggesting that MSLP can affect consumers' internal reference prices. Whether the use of "manufacturer's suggested list price" is deceptive or informative depends on the meaning assigned to it by consumers and whether the product is actually sold at that price. If the product has rarely been sold at the MSLP, then it conveys little information and will most likely be deceptive (in accordance with Sec. 233.3). The MSLP becomes merely a wish price, an amount at which the manufacturer wishes the product would or could be sold.

## Recommendations

Based on the review of the comparative price advertising studies, recent court cases, and the FTC's guidelines for pricing, recommendations for public policy makers, managers, and researchers are developed.

### Public Policy Makers

The most obvious deceptive comparative price advertisement uses a false, or inflated, reference price to suggest a deal or bargain to the consumer. Clearly, from a public policy perspective, a reference price should be truthful. Public policy should encourage the use of reference prices that are easily verified (e.g., a competitor's price) [Committee on Consumer Policy 1979]. This would not only assist in the investigation of the veracity of the claim by authorities but might eliminate the need for such investigation, since consumers could easily verify price claims themselves.

Public policy makers should discourage the use of reference prices that are based on the seller's subjective assessment of the value of the product (FTC Section 233.3: Comparable Value Comparison). Although these reference prices may be truthful in the eyes of the advertiser, the high degree of variation in estimating a subjective assessment of worth or value leaves most estimates suspect (e.g., "valued at," or "a total value of ...," or "worth...,"). Because of differing perspectives, the value of a product is likely to vary across individuals [Zeithaml 1988]. These subjective reference prices are difficult to verify.

A less obvious deceptive comparative price advertising practice uses vague or misleading semantic phrases. For example, instead of simply labeling a bargain, "special," which is a vague description, the seller should also provide specific information on why the bargain is special (e.g., to close out inventory), the length of time the special will run, and the precise savings to the consumer. The purpose of semantic cues is to communicate information about prices to the consumer. Public policy makers should discourage the use of vague semantic cues and encourage the provision of additional information about the offer (e.g., the nature of the bargain, relevant time, and precise savings) so consumers can make more accurate assessments of the bargain.

Communication involves the sharing of meaning between the sender (the advertiser) and the receiver (the consumer). To the extent that the meaning of the semantic cue is not shared, the accuracy of the comparative price claim is reduced (i.e., the claim is vague). More specific information reduces the ambiguity of the semantic cue. One way for public policy makers to develop shared meaning is to legally define the common semantic cues used in comparative price advertisements and then educate the public as to these defi-

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

nitions and enforce their appropriate use. This is similar to other labeling practices such as the terms used to label different levels of cut and fat in ground meat (e.g., ground round, ground chuck, ground beef).

The informative content of these semantic cues must be weighed against their potential for deception. Policy makers, such as states' attorneys and legal experts, as well as sellers need an awareness of available consumer research and the research methods used for evaluating whether a retail price promotion is deceptive [Armstrong et al. 1979; Gardner 1975; Russo et al. 1981; Richards 1990a]. Public policy makers must incorporate consumer research findings into the assessment of whether or not a comparative price claim is deceptive.

The research to date suggests that public policy makers should discourage the use of a MSLP [Ahmed and Gulas 1982; Gotlieb and Fitzgerald 1990]. Although the label may be legitimate in some instances, logically it appears that if the MSLP were indeed valid the product would rarely be sold at a lower price. In other words, if a majority of the stores in a given geographical area were able to sell the product at MSLP, stores would only occasionally offer the product for sale at a lower price since, ostensibly, demand would be stable at the higher MSLP. Consequently, if the product is sold at the MSLP, there is no advantage in using this semantic cue. If the product is sold a lower price on more than a few occasions, the MSLP is no longer valid. Therein lies the paradox of MSLP. The purpose of labeling a price as a MSLP is to convey a product value greater than the actual selling price; yet, if done so on more than a few occasions, the MSLP is no longer a valid estimate of the product's value.

The only instance the MSLP constitutes a valid claim is when an occasional price reduction occurs. This paradox suggests that the overall value to the consumer in sellers using MSLP is marginal at best. The paradox also suggests that it may be more accurate and less misleading if sellers simply use "regular price" instead of MSLP. Thus, it may be appropriate for public policy makers to discourage the use of MSLP.

Finally, the use of comparative price advertisements that compare a selling price to competitors' prices (e.g., their price/our price), or prices from suppliers (our cost/your price) should require identification of the competitor or supplier [Committee on Consumer Policy 1979]. In order for comparative price claims to be most effective, the claim should be easily verifiable by the consumer. The claim that a price is one charged by a competitor and then not identifying that competitor places an undue burden on the consumer to verify the truthfulness of the claim.

## Managers

Managers should be familiar with FTC regulations, since they provide guidance for the use of comparative price advertisements. From an ethical viewpoint, managers should use truthful reference prices in comparative price advertisements. This practice reduces the risk of deception and may be more effective in influencing consumer choice [Moore and Olshavsky 1989]. Comparative price advertisements can be used by retailers to suggest an external reference

price that the consumer may use in forming perceptions of acquisition value and transaction value [Lichtenstein and Bearden 1989; Urbany et al. 1988]. However, if the reference price supplied is genuine and the consumer uses the sale price to form perceptions of acquisition value or discounts or ignores the reference price to form perceptions of transaction value, the managers have not satisfied the objectives of the advertisement. Moreover, price claims should be objective rather than subjective, since objective claims are more precise and enhance the opportunity for shared meanings and, consequently, reduce the potential for deception [Ford et al. 1990; Mobley et al. 1988].

## Researchers

The current research does not address all important public policy issues. The review (Table 2) indicates that existing research has not addressed the effects of retail price comparisons and comparable value comparisons (Section 233.2) [cf., Gotlieb and Sarel 1991]. Clearly, research is needed to address how price comparisons affect consumers' perceptions of value as well as search and purchase behavior. Similarly, bargain offers based on the purchase of other merchandise (Section 233.4), e.g., "buy one get one free" offers, need to be researched. By contrast, a sufficient volume of research has been conducted on former price comparisons (Section 233.1), and a meta-analysis at this stage may be informative. In addition, it is critical that researchers incorporate the legal definitions as a guide to the operationalization of constructs and discuss the public policy implications of their findings.

Research also needs to examine the long-term impact of comparative price advertisements on consumers' perceptions and behavioral responses. Time-series data from a household panel would be helpful in addressing this area. This research could then approach issues such as whether consumers discount reference prices more for retailers that use them more often and whether a relationship exists between exposure to comparative price claims and the level of discounting that most consumers employ. Moreover, can comparative price claims be so pervasive that consumers eventually disregard the reference prices? This latter question is especially relevant because of the recent popularity of television shopping channels, where virtually every product is offered for sale with at least one, and often several, reference prices.

The meaning that consumers assign to different semantic cues needs to be further researched. How do consumers interpret the phrases "compare at," "special," or "their price/our price?" Until consumers' interpretations of these phrases are assessed, the potential for deception is open to debate. The current research suggests that consumers discount most reference price claims, regardless of their veracity [Blair and Landon 1981; Della Bitta et al. 1981; Urbany et al. 1988]. However, a question remains as to whether different semantic cues result in different levels of discounting. For example, do consumers discount "their price" claims more, less, or about the same as "compare at" claims?

The effects of advertiser credibility on consumers' perceptions of price-promotion information have only recently

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

Comparative Price Advertising

**Table 2.    Review of Federal Trade Commission Guidelines Studied**

| Study | Former Price Comparisons Sec. 233.1 | Retail Price Comparisons Sec. 233.2 | Manufacturers Suggested List Price Sec. 233.3 | Bargain Price Offers Sec. 233.4 | Other Price Comparisons Sec. 233.5 |
|---|---|---|---|---|---|
| Fry & McDougall (1974) | X | | | | |
| Barnes (1975) | X | | | | |
| Keiser & Krum (1976) | X | | | | |
| Sewall & Goldstein (1978) | | | X | | |
| Berkowitz & Walton (1980) | X | | | | |
| Blair & Landon (1981) | X | | X | | |
| Della Bitta et al. (1981) | X | | | | |
| Ahmed & Gulas (1982) | | | X | | |
| Raju and Hastak (1983) | X | | | | |
| Friedman et al. (1982) | X | | | | |
| Oglesby (1984) | X | | | | |
| Bearden et al. (1984) | X | | | | |
| Liefeld & Heslop (1985) | X | | X | | |
| Varadarajan (1986) | X | | | X | |
| Chapman (1987) | X | | | | |
| Burton & Lichtenstein (1988) | X | | | | |
| Lichtenstein & Bearden (1988) | X | | | | |
| Mobley et al. (1988) | X | | | | |
| Urbany et al. (1988) | X | | | | |
| Lichtenstein & Bearden (1989) | X | | | | |
| Lichtenstein et al. (1989) | X | | | | |
| Moore & Olshavsky (1989) | X | | | | |
| Diamond & Sanyal (1990) | | | | | |
| Gotlieb (1990) | X | | | | |
| Gotlieb & Fitzgerald (1990) | | | X | | |
| Gotlieb & Swan (1990) | X | | | | |
| Inman et al. (1990) | X | | | | |
| Gotleib & Sarel (1991) | | X | | | |

Note: X indicates that study examined issues involving a particular Federal Trade Commission section.

begun to be investigated [Gotlieb 1990; Gotlieb and Sarel 1991; Gotlieb and Swan 1990]. It is likely that the potential for deception grows with increasing source credibility. That is, consumers may be more likely to believe a false reference price when it is communicated by a highly credible seller. Moreover, is it possible that a retailer or manufacturer with low credibility can employ a spokesperson with high credibility, thereby communicating a credible comparative price advertisement? Research needs to further examine the roles of advertiser and source credibility.

Little is known about the effect of different media on consumer perceptions of comparative price claims. The popularity of television shopping channels raises the issue of whether the medium plays a role in the effects of comparative price claims. Whether comparative price claims are more believable in newsprint, catalogues, magazines, or on television is yet undetermined. If there are certain media where comparative price advertisements appear more believable to consumers than others, the potential for deception is enhanced. Likewise, whether comparative price claims are more believable when presented in certain formats and whether certain media enhance or detract from the believa-

bility of claims in certain formats are important research issues. Future research needs to explore these queries.

## Conclusion

This paper addressed a critical public policy question regarding the potential for comparative price advertising to be informative or deceptive. The public policy implications of twenty-eight studies examining comparative price advertising were reviewed and recommendations were presented.

In summary, policy makers need to be certain that the meanings assumed and articulated in policy and law are as congruous as possible with the ordinary consumer's interpretations. More specifically, the use of MSLP in general is of questionable value and deserves further scrutiny. Researchers need to investigate the meanings that consumers assign to various semantic cues, the long term effects of exposure to comparative price advertisements, the impact of contextual cues such as media and format, the influence of different semantic cues on levels of discounting, and the effects of source credibility. For retailers and advertisers, the research suggests that vague information presented in a comparative price advertisement may not help communicate the intended message, because such information tends to be dis-

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

counted by consumers. As the use of comparative price advertising increases, the need to address the issues developed in this paper becomes more critical.

# References

Agins, Teri (1990), "Low Prices or Low Practices? Regulators Cast Wary Eye on Retailers' Many Sales," *Wall Street Journal,* (February 13), B1, B7.

Ahmed, Sadrudin A. and Gary M. Gulas (1982), "Consumers' Perception of Manufacturers' Suggested List Price," *Psychological Reports,* 50 (April), 507-518.

Armstrong, Gary M., Metin N. Gurol, and Frederick A. Russ (1979), "Detecting and Correcting Deceptive Advertising," *Journal of Consumer Research,* 6 (December), 237-246.

Baer, William J. (1988), "At the Turning Point: The Commission in 1978," *Journal of Public Policy & Marketing,* 7, 11-20.

Barnes, James G. (1975), "Factors Influencing Consumer Reaction to Retail Newspaper 'Sale' Advertising," in *Proceedings,* Edward M. Mazze, ed. Fall Educators' Conference, Chicago, Ill.: American Marketing Association, 37, 471-477.

Bearden, William O., Donald R. Lichtenstein, and Jesse E. Teel (1984), "Comparison Price, Coupon, and Brand Effects on Consumer Reactions to Retail Newspaper Advertisements," *Journal of Retailing,* 60 (Summer), 11-36.

Berkowitz, Eric N. and John R. Walton (1980), "Contextual Influences on Consumer Price Responses: An Experimental Analysis," *Journal of Marketing Research,* 17 (August), 349-358.

Blair, Edward A. and E. Laird Landon, Jr. (1981), "The Effects of Reference Prices in Retail Advertisements," *Journal of Marketing,* 45 (Spring), 61-69.

Brandt, Michael T. and Ivan L. Preston (1977), "The Federal Trade Commission's Use of Evidence to Determine Deception," *Journal of Marketing,* 41 (January), 54-62.

Burton, Scot and Donald R. Lichtenstein (1988), "The Effect of Ad Claims and Ad Context on Attitude Toward the Advertisement," *Journal of Advertising,* 17 (1), 3-11.

Chapman, Joseph D. (1987), "The Impact of Discounts on Subjective Product Evaluations," Ph.D. diss., Virginia Polytechnic Institute and State University, Blacksburg, Va.

Committee on Consumer Policy (1979), *Bargain Price Offers and Similar Practices,* Paris, France: Organization for Economic Cooperation and Development.

Compeau, Larry D. and Dhruv Grewal (1990), "Comparative Price Advertising: A Methodological Review and Critique," in *AMA Educators' Proceedings,* Chicago, Ill.: American Marketing Association, 56.

Cooper, Harris M. (1984), *The Integrative Research Review: A Systematic Approach,* Beverly Hills, Calif.: Sage Publications.

Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis (1981), "Consumer Perceptions of Comparative Price Advertisements," *Journal of Marketing Research,* 18 (November), 416-427.

Diamond, William D. and Abhijit Sanyal (1990), "The Effect of Framing on the Choice of Supermarket Coupons," in *Advances in Consumer Research,* Marvin Goldberg, Gerald Gorn, and Richard W. Pollay, eds. Provo, Utah: Association for Consumer Research, 17, 488-493.

Dodds, William B., Kent B. Monroe, and Dhruv Grewal (1991), "The Effects of Price, Brand, and Store Information on Buyers' Product Evaluations," *Journal of Marketing Research,* 28 (August), 307-319.

Ford, Gary T. and John E. Calfee (1983), "Consumer Psychology Research Needs at the Federal Trade Commission," in *Proceedings of the Division of Consumer Psychology,* James C. Anderson, ed. Anaheim, Calif.: Annual Convention of the American Psychological Association, 118-120.

_____ and _____ (1986), "Recent Developments in FTC Policy on Deception," *Journal of Marketing,* 50 (July), 82-102.

_____ , Darlene B. Smith, and John L. Swasy (1990), "Consumer Skepticism of Advertising Claims: Testing Hypotheses from Economics of Information," *Journal of Consumer Research,* 16 (March), 433-441.

Friedman, Hershey H., Philip E. Weingaten, Linda W. Friedman, and Ralph Gallay (1982), "The Effects of Various Price Markdowns on Consumers' Ratings of a New Product," *Journal of the Academy of Marketing Science,* 10 (Fall), 432-437.

Fry, Joseph N. and Gordon H. McDougall (1974), "Consumer Appraisal of Retail Price Advertisements," *Journal of Marketing,* 38 (July), 64-74.

Gardner, David M. (1975), "Deception in Advertising: A Conceptual Approach," *Journal of Marketing,* 39 (January), 40-46.

Gotlieb, Jerry B. (1990) "Communicating Price-Perceived Quality Relationship," *Journal of Applied Social Psychology,* 20 (March), 404-423.

_____ and Cyndy T. Fitzgerald (1990), "An Investigation Into the Effects of Advertised Reference Prices on the Price Consumers Are Willing to Pay for the Product," *Journal of Applied Business Research,* 6 (1), 59-69.

_____ and Dan Sarel (1991), "Effect of Price Advertisement on Perceived Quality and Purchase Intentions," *Journal of Business Research,* Forthcoming.

_____ and John E. Swan (1990), "An Application of the Elaboration Likelihood Model," *Journal of the Academy of Marketing Science,* 18 (Summer), 221-228.

Grewal, Dhruv and Diana S. Grewal (1991), "Pricing Responsibility: The Retailer or the State?," *Journal of the Academy of Marketing Science,* 19 (Summer), 276-277.

_____ and Kent B. Monroe (1991), "Information Cues, Internal Reference Prices and Product Evaluations: A Conceptual Framework and Synthesis of Past Research," Coral Gables, Fla.: University of Miami, Working paper.

Hisrich, Robert D. (1983), "Executive Advertisers' Views of Comparison Advertising," *Sloan Management Review,* 25 (Fall), 39-50.

Honigwachs, Joshua (1987), "Is It Safe to Call Something Safe? The Law of Puffing in Advertising," *Journal of Public Policy & Marketing,* 6, 157-170.

Inman, J. Jeffrey, Leigh McAlister, and Wayne Hoyer (1990), "Promotion Signal: Proxy for a Price Cut?" *Journal of Consumer Research,* 17 (June), 74-81.

Jones, Mary Gardner (1988), "The Federal Trade Commission in 1968: Times of Turmoil and Response," *Journal of Public Policy & Marketing,* 7, 1-10.

Kamen, Joseph and Robert Toman (1970), "Psychophysics of Prices," *Journal of Marketing Research,* 7 (February), 27-35.

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

Keiser, Stephen K. and James R. Krum (1976), "Consumer Perceptions of Retail Advertising With Overstated Price Savings," *Journal of Retailing,* 52 (Fall), 27-36.

Kinnear, Thomas C. and Ann R. Root (1988), "The FTC and Deceptive Advertising in the 1980s: Are Consumers Being Adequately Protected?" *Journal of Public Policy & Marketing,* 7, 40-48.

Klein, Noreen M. and Janet E. Oglethorpe (1987), "Reference Points in Consumer Decision Making," in *Advances in Consumer Research,* Melanie Wallendorf and Paul Anderson, eds. Provo, Utah: Association for Consumer Research, 14, 183-187.

Laczniak, Russell N. and Sanford Grossbart (1990), "An Assessment of Assumptions Underlying the Reasonable Consumer Element in Deceptive Advertising Policy," *Journal of Public Policy & Marketing,* 9, 85-99.

Lichtenstein, Donald R. and William O. Bearden (1986), "Measurement and Structure of Kelley's Covariance Theory," *Journal of Consumer Research,* 13 (September), 290-296.

_____ and _____ (1988), "An Investigation of Consumer Evaluations of Reference Price Discount Claims," *Journal of Business Research,* 17 (September), 189-200.

_____ and _____ (1989), "Contextual Influences on Perceptions of Merchant-Supplied Reference Prices," *Journal of Consumer Research,* 16 (June), 55-66.

_____, Scot Burton, and Bradley S. O'Hara (1989), "Marketplace Attributions on Consumer Evaluations of Discount Claims," *Psychology and Marketing,* 6 (Fall), 163-180.

Liefeld, John and Louise A. Heslop (1985), "Reference Prices and Deception in Newspaper Advertising," *Journal of Consumer Research,* 11 (March), 868-876.

Mobley, Mary F., William O. Bearden, and Jesse E. Teel (1988), "An Investigation of Individual Responses to Tensile Price Claims," *Journal of Consumer Research,* 15 (September), 273-279.

Monroe, Kent B. (1971), "Measuring Price Thresholds by Psychophysics and Latitudes of Acceptance," *Journal of Marketing Research,* 18 (November), 460-464.

_____ (1990), *Pricing: Making Profitable Decisions,* 2d ed., New York, N.Y.: McGraw Hill Book Co.

_____ and Joseph D. Chapman (1987), "Framing Effects on Buyers Subjective Product Evaluations," in *Advances in Consumer Research,* Melanie Wallendorf and Paul Anderson, eds. Provo, Utah: Association for Consumer Research, 14, 193-197.

_____ and R. Krishnan (1985), "The Effect of Price On Subjective Product Evaluations," in *Perceived Quality: How Consumers View Stores and Merchandise,* Jacob Jacoby and Jerry C. Olson, eds. Lexington, Mass.: Lexington Books, 209-232.

Moore, David J. and Richard W. Olshavsky (1989), "Brand Choice and Deep Price Discounts," *Psychology and Marketing,* 6 (Fall), 181-196.

Muehling, Garrel D. and Norman Kangun (1985), "The Multi-Dimensionality of Comparative Advertising: Implications for the Federal Trade Commission," *Journal of Public Policy & Marketing,* 4, 112-128.

Oglesby, Bobbie D. (1984), "Price and Semantic Cues' Effect on Perceived Quality and Attitude," *Marketing Comes of Age,*

David M. Klein and Allen E. Smith, eds. Boca Raton, Fla.: Southern Marketing Association, 308-312.

Preston, Ivan L. (1976), "A Comment on "Defining Misleading Advertising" and "Deception in Advertising," *Journal of Marketing,* 40 (July), 54-60.

Raju, P.S. and Manoj Hastak (1983), "Pre-Trial Cognitive Effects of Cents-Off Coupons," *Journal of Advertising,* 12 (2), 24-33.

Richards, Jef I. (1990a), *Deceptive Advertising: Behavioral Study of a Legal Concept,* Hillsdale, N.J.: Lawrence Erlbaum Associates.

_____ (1990b), "A 'New and Improved' View of Puffery," *Journal of Public Policy & Marketing,* 9, 73-84.

Russo, J. Edward, Barbara L. Metcalf, and Debra Stephens (1981), "Identifying Misleading Advertising," *Journal of Consumer Research,* 8 (September), 119-131.

Sawyer, Alan G. and Peter R. Dickson (1984), "Psychological perspectives on Consumer Response to Sales Promotions," in *Research on Sales Promotions: Collected Papers,* Katherine E. Jocz, ed. Cambridge, Mass.: Marketing Science Institute, Report No. 84-104, 1-21.

Sewall, Murphy A. and Michael H. Goldstein (1979), "The Comparative Price Advertising Controversy: Consumer Perceptions of Catalog Showroom Reference Prices," *Journal of Marketing,* 43 (Summer), 85-92.

Stigler, George J. (1961), "The Economics of Information," *Journal of Political Economy,* 69 (June), 213-25.

Strenio, Andrew J., Jr. (1988), "The FTC in 1988: Phoenix of Finis?" *Journal of Public Policy & Marketing,* 7, 21-39.

Thaler, Richard (1985), "Mental Accounting and Consumer Choice," *Marketing Science,* 4 (Summer) 199-214.

Turgeon, Normand and David J. Barnaby (1988), "Comparative Advertising: Two Decades of Practice and Research," in *Current Issues and Research in Advertising,* James H. Leigh and Claude R. Martin, Jr., eds. Ann Arbor, Mich.: The University of Michigan, 11 (1-2), 41-65.

Urbany, Joel E., William O. Bearden, and Dan C. Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search," *Journal of Consumer Research,* 15 (June), 95-110.

Varadarajan, P. Rajan (1986), "Consumers' Behavioral Responses to Coupon Price Promotions: An Empirical Inquiry," in *AMA Educators' Proceedings,* Terence A. Shimp et al., eds. Chicago, Ill.: American Marketing Association, 52, 211.

Wilkie, William L. and Paul W. Farris (1975), "Comparison Advertising: Problems and Potential," *Journal of Marketing,* 39 (October), 7-15.

Wilson, R. Dale (1978), "Comparative Advertising: Some Current Considerations for Managerial Planning and Strategy," in *Current Issues and Research in Advertising,* James Leigh and Claude R. Martin, Jr., eds. Ann Arbor, Mich.: The University of Michigan, 5-22.

Zeithaml, Valarie A. (1988), "Consumer Perceptions of Price, Quality, and Value: A Means-End Model and Synthesis of Evidence," *Journal of Marketing,* 52 (July), 2-22.

This content downloaded from 73.212.124.7 on Thu, 24 May 2018 00:48:51 UTC
All use subject to http://about.jstor.org/terms

# EXHIBIT 111

# Fake Discounts Drive Real Revenues in Retail

Donald Ngwe[*]

Harvard Business School

October 14, 2017

## Abstract

Prices in a wide variety of contexts are often presented in three parts: an original or suggested list price, a discount off that price, and the final selling price. Limited empirical evidence is available that speaks to the relative impact of each component on purchase behavior, even as theories abound. Measuring these impacts is of critical importance to sellers, consumers, and to regulators who are keen on enforcing deceptive advertising guidelines against "fictitious pricing," or the practice of quoting list prices that do not truthfully reflect prior selling prices. This paper uses a large retail transactions data set that features wide variations in these pricing components within a relatively homogeneous product space. The data set has the unique feature of containing sales records wherein a subset of products have verifiably fictitious list prices and discounts, allowing for measurement of their impact on purchase incidence in actual retail settings. I outline the broad theories that address fictitious pricing, list their corresponding predictions, and examine their relevance empirically. I find that fake list prices have a strong influence on purchase outcomes, with a 1-dollar increase in the list price having the same positive effect on purchase likelihood as a 77-cent decrease in the actual selling price. This effect is largely invariant to consumers' experience with the brand, as inferred from their prior purchases. In addition, I find evidence for the dependence of this effect on store-level reference points such as the lowest offered discount within the store. These results have important implications for how managers should set each pricing component to maximize profits, as well as for how regulators should assess the welfare effects of allowing firms to post fake list prices.

[*]E-mail: dngwe@hbs.edu. This paper is based on a chapter of my dissertation. I am grateful to my dissertation committee members Chris Conlon, Brett Gordon, Kate Ho, Michael Riordan, and Scott Shriver for their guidance and advice.

# 1   Introduction

Virtually all firms engage in some form of discount pricing. There are several reasons for which firms might drop the price of a good over time: when it seeks to discriminate between consumers according to their willingness to pay, as a means of managing its inventory, or when it faces less demand uncertainty after the good's introductory phase. In many of these instances, consumers can be thought of as having nearly full information and making rational responses to price incentives. In contrast, this paper focuses on motivations for discount pricing that arise from consumers having imperfect information or possibly exhibiting irrational behavior. These are motivations that might encourage firms to post high "original" prices at which products were never actually available for purchase.

This practice, termed "fictitious pricing" by the Federal Trade Commission (FTC), occasionally results in litigation. In one recent case, a class-action lawsuit was filed against Kohl's Department Stores in California for allegedly misstating in advertising that items had been marked down (Dolan 2013). In reversing an earlier district court dismissal of the case, the US 9th Circuit Court of Appeals stated that California consumer laws permit such lawsuits if the consumer would not have made the purchase but for the perceived bargain. In December 2016, JCPenney, Sears, Macy's, and Kohl's were all hit with lawsuits over similar allegations. JCPenney and Kohl's had previously been sued over the same practice and settled respectively for $50 million and $6.5 million (Popken 2016).

Fictitious pricing is one area in which enforcement differences between states and the FTC loom large. Between 1950 and 1970, 30% of FTC challenges to advertising were related to "fictitious price claims" (Pitofsky et al. 2003). Since 1979, however, the FTC has not brought a single fictitious pricing case to court. Several FTC chairs have indicated that enforcement actions in this area have done more harm than good. This is because of the difficulty and arbitrariness with which a "genuine" discount might be differentiated from a deceptive one. In the current state of enforcement, state attorneys-general apply local statutes in bringing cases; however, enforcement is highly uneven, with major cases attracting widespread attention every few years but with many firms consistently ignoring fictitious pricing statutes with impunity.

The main obstacle in litigating individual cases, and therefore in policing this practice more broadly in the marketplace, stems from the difficulty in assessing private damages from fictitious pricing (Friedman 2015). Various recent cases in Illinois against large retailers such as Joseph A Bank[1], Carter's[2], and QVC[3] were found in favor of the sellers due to the plaintiffs' failure in establishing economic harm due to false price claims. The question of whether consumers are deceived by fake price claims is also a factor, with one court decision seeing no fault because consumers "see through the ruse."[4]

In this paper, I identify patterns in how consumers respond to false and genuine discount claims by the same seller. I use data from a dominant fashion goods retailer that makes heavy use of discounting in its outlet stores. This data set offers a rare and unique opportunity to study this pricing strategy because it records both list and selling prices, as well as repeat purchases. A portion of these list prices are observably genuine, while the remainder are fictitious. As with many brands and retailers, the firm implements random discounts across both time and products in-store, providing much variation in final selling prices for each product.

While a number of earlier studies have examined the question of fake prices in laboratory experiments or survey methodologies, there have been, to my knowledge, no prior studies that establish the effect of fake list prices on purchase behavior in actual retail settings. There are several benefits from using transactions data to address this question. Whereas survey methodologies must rely on a constructed notion of what constitutes the actual "market price" for a particular good, in my empirical setting such a quantity is directly observed from the data. Using sales data also sidesteps the issue of ensuring incentive compatibility in measuring changes to consumers' intent to purchase. Perhaps the most important advantage of using sales data is the ability to measure the effects across hundreds of different products, rather than relying on a few focal products in the typical survey questionnaire.

I use a parsimonious discrete choice model of demand to estimate the effect of list prices on purchase likelihood. Identification of this effect arises from variation in list prices within the same product

---

[1]No. 12-C-7782 (N.D. Ill. July 25, 2013).
[2]598 F.3d 362 (7th Cir. 2010).
[3]888 N.E.2d 1190 (Ill. App. Ct. 2008).
[4]B. Sanfield, Inc., 258 F.3d at 579.

across different styles. The large number of observations, combined with the firm's national pricing policy, permits the estimation of style and color fixed effects, without the need to use instrumental variables to control for endogeneity. I explore how responses to list prices vary according to consumer subgroups and depend on contextual reference points.

I find that consumer responses to list prices are consistent with theories that treat prices as a signal of product quality and that hypothesize reference-dependent behavior in how consumers evaluate prices. Controlling for selling prices and other product characteristics, a higher list price substantially increases a good's purchase probability. Moreover, this effect is larger for products with fake list prices than for those for which list prices are genuine. Finally, this effect seems to be invariant to the consumer's level of information.

One might expect fake list prices to have a diminishing marginal effect on purchase likelihood, such that at some point increasing the list price further would cease to be effective. Somewhat puzzlingly, I find no support for this relationship in the data, and in fact find some support for an exponentially increasing relationship. I find that reference dependence offers an explanation of this phenomenon. Consumers take the minimum offered discount in a store as the reference point, to the extent that purchase likelihood is invariant to the minimum discount and highly dependent on the distance between product-specific discounts and the benchmark.

This reference dependence is in line with the idea that firms exploit bargain-hunting behavior through false prices (Armstrong & Chen 2013). This effect may be particularly potent in outlet stores, in which most items are discounted. Yet the attractiveness of a bargain must go hand-in-hand with list prices being a reliable signal of quality. This implies that the firm must maintain the credibility of these prices even as it employs them to manipulate consumer behavior.

Taken together, these results confirm that fake list prices and discounts play a large role in consumer shopping decisions, but point to the need to for new thinking about this role in ways that have not been emphasized by regulators, courts, or prior literature. It is possible, for example, that fake list prices play an important role in relaying information about product quality in an environment where many consumers face high uncertainty. This may be particularly true in fashion, where a product's marginal cost may be very weakly correlated with its quality.

Setting fake list prices is a unique problem for the firm, as list prices can be thought of as a signal of quality akin to certain forms of advertising. Yet unlike advertising, setting higher fake list prices is costless to the firm. Setting optimal list prices, therefore, involves balancing their (initially) demand-enhancing effects versus the possibility that consumers may eventually lend less credibility to these signals.

The paper proceeds as follows. Section 2 reviews the related literature on discount pricing and reference dependence. Section 3 describes the data used for the empirical analysis and provides some descriptive statistics. Section 4 outlines a demand model and presents parameter estimates. Section 5 concludes and points to directions for future work.

## 2   Related literature

Forms of fictitious pricing have been studied in a wide variety of circumstances. The environment I consider has the following features: a single seller that produces goods of varying quality within one category, a weak regulatory environment, consumers that have less information than the firm about product quality and past prices, and the possibility of repeat purchases. Additionally, the marginal cost of production may not be monotonically increasing with quality. This occurs, for instance, in the manufacture of fashion goods for which the attractiveness of the final product may have little relationship with the processes involved in its production.

Several authors in the economics literature have recognized the importance of price as a signal of quality for uninformed consumers. Bagwell and Riordan (1991) argue that high and declining prices can indicate that a product is of high quality. In their framework, high prices are a credible signal of quality because high quality, high-cost firms are more willing to restrict sales volume than low-cost firms. Over time, as the proportion of uninformed consumers decreases, it becomes easier for the high-cost firm to signal its quality and thus its price lowers toward the full-information monopoly price.

Armstrong and Chen (2013) examine a similar environment, but one in which quality is endoge-nously determined and consumers can potentially be misled by false price announcements. They

find that when consumers are ignorant of the initial price, the firm finds it profitable to produce a high quality good and announce the initial price when it is constrained to tell the truth. However, it does even better by producing a low quality good, and subsequently misleading consumers by announcing a high initial price. This is related to a key empirical question of particular interest to regulators: Are consumers deceived by fake discounts?

Results from behavioral economics provide additional and alternative explanations for why high suggested prices might be effective in driving demand. Bordalo, Gennaioli and Shleifer (2013) argue that salient attributes are overweighted by consumers when choosing between goods. They proceed to show how this logic can explain "misleading sales," which are mostly identical to the legalistic definition of fictitious pricing. The key difference between their framework and the empirical setting here is that retailers inflate original prices during misleading sales, instead of maintaining the same false original price throughout a product's lifetime.

Recently authors have begun to reconcile anomalous patterns in field data using concepts generated in behavioral economics. One such example is Hastings and Shapiro (2012), who find that consumers switch from premium to regular gasoline given a uniform price increase to an extent that cannot be accounted for by wealth effects. They present this as evidence of mental accounting, which manifests itself through the infungibility of money between an individual's different purposes (Thaler 1985).

The above-mentioned theories frequently have conflicting predictions on both consumer behavior and firm decisions, owing to difference in fundamental assumptions. (See Table 1 for a summary. A similar table containing results in marketing research and a comprehensive list of references is contained in Grewal & Compeau 1992.) Complementing these theories is a robust stream of marketing research that seeks to measure the impact of reference prices on consumer perception and behavior. An early instance is Blair and Landon (1981), who present example ads to shoppers in a Houston shopping mall and elicit their understanding of the actual potential savings available given the advertised reference prices. They find that, on average, shoppers do not accept the full advertised savings at face value. The authors do not, however, establish the effects of these reference prices on purchase probabilities. Plausible and exaggerated references prices have been found in other work to have positive effects on purchase likelihoods, as well as a negative effect on the likelihood of further search (e.g. Biswas & Blair 1991, Della Bitta, Monroe & McGinnis 1981,

and Urbany, Bearden & Walker 1988).

Grewal and Compeau (1992) provide a discussion of the available evidence in marketing research and explore its implications with respect to the prevailing FTC guidelines on deceptive advertising and state-level statutes on allowable price claims. They place emphasis on the latitude sellers have to make false price claims as well as the susceptibility of consumers to these claims. They conclude by advocating strict adherence to truthful claims to sellers on an ethical basis, while recommending stringent enforcement by regulators.

Prior research, beginning with the seminal work of Tversky and Kahneman (1981) and extending into a substantial amount of marketing research has examined the role of various reference points, and specifically in-store promotions, on consumer choice. Consumers have been found to consider various price signals in addition to the current selling price when making purchase decisions, including past-period promotions and other current-period prices (e.g. Lattin & Bucklin 1989, Mayhew & Winer 1992, Rajendran & Tellis 1994, Kumar et al. 1998). In addition, consumers have also been document to "discount" discounts, depending on the size of the discount (Gupta & Cooper 1992) or the frequency of promotions (Marshall & Leng 1992).

Perhaps because of the rareness of obtaining sales data that contain posted fake list prices, there has been little empirical work performed within actual retail settings. The availability of sales data from a seller that practices fictitious pricing presents a rare and unique opportunity to measure the impact of different forms and levels of reference pricing on purchase outcomes. It is also an opportunity to test and measure the relative importance of analytic results on the various forms of discount pricing.

## 3   Data and industry background

Data is provided by a major fashion goods manufacturer and retailer in the United States. The firm sells above 90% of its products by revenue through its own physical stores. The firm derives the majority of its revenue from a single product category. This paper focuses on sales patterns within this product category. The firm is the market leader in this category with a market share

Table 1: Theories of fictitious pricing in economics

| Notion | Papers | Critical Assumptions | Predictions |
|--------|--------|---------------------|-------------|
| Signaling | Bagwell & Riordan (1991); Armstrong & Chen (2013) | Some consumers mistakenly believe that fake prices are original prices. | Less-informed consumers will be more likely to buy items with high "original" prices then better-informed consumers. |
| Bargain-hunting | Armstrong & Chen (2013) | Demand is disproportionately higher for unexpectedly low prices. | The firm finds it profitable to charge different prices to identical consumers. |
| Salience | Bordalo, Gennaioli & Shleifer (2013) | Consumers overweight "salient" attributes. | Demand for higher quality goods will rise more after a uniform price increase.

Higher quality goods are more likely be put on sale. |

A similar table containing results in marketing research and a comprehensive list of references
is contained in Grewal and Compeau (1992).

of about 40%.

The firm operates two types of stores: **regular** and **outlet**. Regular stores are centrally located in cities and do not typically offer discounts on products. Outlet stores are located about an hour's drive away from city centers and offer deep discounts (both real and fake). The firm offers two types of goods: **original** and **factory**. Original goods are first sold at full price in regular stores and then sold at a discount in outlet stores. Factory goods are only sold in outlet stores. Table 2 shows counts of unique products sold in the data by channel and product type. The firm implements a fictitious pricing policy for its factory goods, by indicating list prices that are never actual selling prices.

Table 2: Unique product counts by channel and product type

|                 | Original products | Factory products |
| --------------- | ----------------- | ---------------- |
| Regular channel | 7,167             | 0                |
| Outlet channel  | 8,479             | 3,696            |

The data consist of transaction-level records over a 5-year period. Each record contains the list price of each item and any active discount. Also included are consumer observables, including billing zip code, date of first purchase from the firm, and household ID.

**Consumers.** A total of 16,019,140 unique consumers are observed to make purchases within the sample. Repeat purchases by consumers are observable in the data. The proportion of purchases that are made by return consumers is significant (*see* Figure 1). In the firm's outlet channel, 24% of purchases are made by return consumers. Of this group, 38% have made purchases in the regular channel.

**Products, prices, and channels.** The firm produces different *styles* of its main product, and offers each style in different colors. A product is defined by its style and color. Each style-color combination has only one list price, but styles may vary in list price according to color. The list price is set at the time of product introduction and never changes. The firm's managers explain that there are several reasons why list prices may vary between colors of the same style. One reason is that some colors may be thought of as more desirable than others. Another reason is that colors may be introduced at different times, with timing being a factor in determining a product's

9

Figure 1: Consumers by number of within-sample purchase instances



list price. Yet another reason is that some style-color combinations are regular or outlet channel-specific. Variation in list prices within product styles provides a valuable source of identification. Overall, there are 4,610 styles observed in the data, and an average of 2.93 colors in each style for a total of 13,522 unique products sold.

Each style-color combination is either an original good or a factory good based on the channel in which the product is introduced. Table 3 describes the pricing differences between original and factory goods in outlet stores.[5] Original goods are more expensive than factory goods on average, both in terms of list prices and selling prices. However, there is much variation in these prices over time, and factory goods occasionally carry higher prices than original goods (see Figure B in the Appendix).

Figure 2 graphs the average percent discount over time for original goods and factory goods in the firm's outlet channel. Recall that original goods are sold at full price in the regular channel, while factory goods are sold exclusively in the outlet channel. The similar trend in discount increase over time for these two product classes reflects the firm's policy of trimming prices at even rates across all products over time, regardless of sales performance.

---

[5]Further details are in appendix Table A.

Table 3: Average prices in outlet format

|  | Original goods | Factory goods |
|---|---|---|
| List price | 349.03 | 308.87 |
|  | [177.45] | [85.50] |
| Discount percent | 50.84 | 58.90 |
|  | [13.81] | [11.74] |
| Transactional price | 165.76 | 123.20 |
|  | [85.82] | [38.03] |
| On-shelf composition | 69.64% | 30.36% |
| Revenue composition | 30.90% | 69.10% |

Standard errors are in brackets.

Figure 2: Discounting pattern in outlet channel



Figure 3: Observed selling prices of a typical factory good in the outlet channel



Note: The red line represents the product's list price.

The pattern of discounting implemented by the firm in its outlet stores has store, period, and product-specific components. Across stores and time periods, the firm implements randomized discounting within certain parameters. Occasionally these discounts are also affected by outlet mall-wide events. The product-specific component of discounting is highly correlated with the product's design age, i.e. the time since its introduction. Older-lived products are discounted more heavily. Figure 3 plots the list price and observed selling prices for a representative factory good over time, displaying the resulting discount pattern for a typical product.

The red line on Figure 3 marks the product's list price. Every single purchase instance over the product's lifetime is plotted on the graph; not a single unit was sold at or even near the list price. Not observable from the graph is that 94% of units were sold by the end of 2008. This is consistent with high consumer values for a product's newness in this industry. The remaining purchase observations are consistent with statements by the firm's executives that disavow the use of discounting in order to clear inventory.

12

# 4    Demand

In this section I present a parsimonious discrete choice model of consumer purchase behavior and estimate its parameters using data from a major fashion goods retailer. The initial objective of estimation is to determine whether fake list prices affect purchase behavior keeping all other product attributes, including actual selling prices, constant. Subsequently, I measure how this effect varies between consumer types, product classes, and store conditions. I proceed to decompose consumer sensitivity into different components and ranges of discounting in order to identify the conditions under which list prices are most impactful. Finally, I test for the significance of certain reference points that may influence the effectiveness of discounting.

## 4.1    Baseline model

Let product $j$ in store $m$ and month $t$ be defined by observable characteristics $X_{jt}$, unobservable quality $\xi_j$, list price $LP_j$, and selling price $p_{jmt}$. The indirect utility of consumer $i$ from purchasing product $j$ in market $m$ at time $t$ is

$$u_{ijmt} = \alpha p_{jmt} + X_{jt}\beta + \gamma LP_j + \xi_j + \epsilon_{ijmt} \tag{1}$$

where $\alpha$, $\beta$, and $\gamma$, are parameters to be estimated, and $\epsilon_{ijmt}$ are idiosyncratic demand shocks. This form of utility is similar to previously considered specifications in which other price components or reference prices are included as predictors of demand (e.g. Greenleaf 1995).

Letting $\epsilon_{ijmt}$ be i.i.d. Type-I extreme value, and inverting the resulting system of market share equations (Berry 1994), mean utilities $\delta_{jmt}$ can be written as

$$\log(s_{jmt}) - \log(s_{0mt}) = \delta_{jmt} \equiv \alpha p_{jmt} + X_{jt}\beta + \gamma LP_j + \xi_j \tag{2}$$

where $s_{jmt}$ are market shares and $s_{0mt}$ is the share of the outside good. A consumer is counted as having chosen the outside good if she visited a store but did not make a purchase. Availability of per-period foot traffic counts for each store enables direct measurement of these outside shares.

13

Estimation of demand parameters is by regression of mean utility levels on observables. A market is defined as a store-month. The market size is taken to be the foot traffic recorded in each store-month. Product characteristics $X_{jt}$ include product age and categorical variables relating to style, color, silhouette, material, and *collection*.[6] Store and month fixed effects are also included. Descriptive statistics for these variables in the estimation sample are reported in Table 4.

Table 4: Descriptive statistics for estimation data

|                      | Mean     | St. Dev. |                              | Count  |
|----------------------|----------|----------|------------------------------|--------|
| Market size          | 8,841.77 | 5,925.55 | Markets (store-months)       | 5,704  |
| Inside market shares | 0.0011   | 0.0016   | Stores                       | 131    |
| Selling price        | 137.58   | 55.26    | Months                       | 54     |
| List price           | 325.24   | 98.74    | Unique items (style-colors)  | 13,522 |
| Product age (days)   | 231.38   | 508.91   | Styles                       | 4,052  |
| Factory dummy        | 0.58     | 0.49     | Colors                       | 1,164  |
|                      |          |          | Materials                    | 48     |
|                      |          |          | Silhouettes                  | 32     |
|                      |          |          | Collections                  | 79     |

Table 5 contains the baseline results of demand estimation. Estimates from an OLS regression of mean utility are reported in column 1. Dummies for each categorical variable, as well as for stores and months, are included as explanatory variables. Style fixed effects are left out.[7] As anticipated, purchase probability is positively correlated with list price, negatively correlated with selling price, and negatively correlated with product age. However, these estimates are possibly biased and inconsistent due to a correlation between list price $LP_j$, and consequently, selling price $p_{jmt}$, and unobservable quality $\xi_j$.

The general level of $p_{jmt}$ is determined via a national pricing strategy. Within product and time, variation in $p_{jmt}$ arises from randomized experiments undertaken by the firm in order to gauge the effectiveness of planned promotions, as well as by a systematic decline over product age, which is not influenced by the sales performance of particular products. Therefore, any systematic correlation between $p_{jmt}$ and $\xi_j$ must follow the same mechanism as that between $LP_j$ and $\xi_j$, conditional on product age $age_{jt}$.

---

[6]A collection is a set of products that share the same general design features. Products are presented in shelves according to their collection in the firm's regular channel. In the firm's outlet channel, products are grouped according to other physical characteristics.

[7]There is no variation in materials, silhouettes, or collections within styles.

Table 5: Demand estimates

| VARIABLES | (1) OLS | (2) OLS | (3) IV | (4) OLS | (5) OLS |
|---|---|---|---|---|---|
| selling price $p_{jmt}$ | -0.00265*** [2.05e-05] | -0.00226*** [1.64e-05] | -0.00428*** [7.72e-05] | -0.00122*** [2.48e-05] | -0.00170*** [2.51e-05] |
| list price $LP_j$ | 0.000393*** [1.29e-05] | | | 0.00458*** [0.000210] | 0.00132*** [0.000225] |
| discount$_{jmt}$ | | 0.000393*** [1.29e-05] | 0.000340*** [1.31e-05] | | |
| product age | -0.000139*** [2.34e-06] | -0.000139*** [2.34e-06] | -0.000182*** [2.85e-06] | -0.000193*** [3.07e-06] | -0.000428*** [3.66e-06] |
| factory dummy | 0.520*** [0.00269] | 0.520*** [0.00269] | 0.469*** [0.00330] | -0.0928*** [0.00706] | -0.0807*** [0.00796] |
| store dummies | yes | yes | yes | yes | yes |
| collection dummies | yes | yes | yes | | |
| material dummies | yes | yes | yes | | |
| silhouette dummies | yes | yes | yes | | |
| color dummies | yes | yes | yes | | yes |
| style dummies | | | | yes | yes |
| constant | -7.449*** [0.691] | -7.449*** [0.691] | -6.873*** [0.693] | -7.626*** [0.0690] | -6.650*** [0.798] |
| Observations | 2,416,754 | 2,416,754 | 2,416,754 | 2,416,817 | 2,416,817 |
| R-squared | 0.316 | 0.316 | 0.312 | 0.345 | 0.371 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

In columns 2 and 3 of Table 5, I include

$$\text{discount}_{jmt} \equiv LP_j - p_{jmt} \tag{3}$$

as a dependent variable instead of list price $LP_j$ (Greenleaf 1995). Assuming that discount$_{jmt}$ follows a systematic pattern across products, as the firm's managers claim, this leaves selling price $p_{jmt}$ as the endogenous variable in the equation, instead of both $p_{jmt}$ and $LP_j$. I instrument for price using each product's introduction date, coded as the number of days since a base date. While the firm's pricing benchmarks for new product introductions vary over time, there is no evidence suggesting a relationship between a product's introduction date and its quality. I present the OLS version of the regression in column 2 of Table 5, and instrument for selling price in column 3. As would be expected given the endogeneity of the price variable, the estimated price elasticity is greater in the IV model. The coefficient on list price, however, is relatively stable in both OLS and IV specifications. Table 6 contains estimates of the first stage regression for the IV model.

Columns 4 and 5 of Table 5 contain results of OLS regressions that include style fixed effects as explanatory variables. The regression in column 5 includes color fixed effects as well. Including style dummies rather than broader categorical product attributes improves goodness of fit and has interesting effects on the estimated coefficients. The coefficient on selling price is much smaller in absolute value than in earlier specifications. It is perhaps counterintuitive that estimated price sensitivity is lower when controlling for more product attributes, as the typical concern is that higher quality products are also higher priced. This is, however, consistent with the firm's policy of keeping bestselling styles on the shelf for longer at low prices, going so far as ordering additional production lines to support further sales.

The estimated coefficient for list price (or discount) is much higher by an order of magnitude in the last two specifications, which may also seem counterintuitive. We may have expected the opposite pattern, with higher estimated list price effects when controlling less finely for product attributes, given a supposed positive correlation between product quality and list price. One important factor here may be the seller's inability to precisely forecast the desirability of any particular product, which results in some products with a higher list price being less desirable than products with lower

16

Table 6: First stage regression

| VARIABLES | (1) selling price $p_{jmt}$ |
|---|---|
| introduction date$_j$ | -0.0432*** |
| | [0.000125] |
| discount$_{jmt}$ | 0.0608*** |
| | [0.000546] |
| age$_{jt}$ | -0.0620*** |
| | [0.000146] |
| factory$_j$ | -10.58*** |
| | [0.109] |
| | |
| store dummies | yes |
| collection dummies | yes |
| color dummies | yes |
| | |
| constant | 1,022*** |
| | [26.39] |
| | |
| Observations | 2,464,200 |
| R-squared | 0.322 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

list prices.

I choose the model used in column 5 of Table 5 as the preferred specification, and the baseline for all succeeding analyses. This specification enables measurement of list price effects at the most granular possible level given the context: variation in list prices between different colors of the same style. This specification also precludes the need to use instrumental variables techniques, as style and color fixed effects absorb all physical product attributes and prices are determined at the national level.

As seen when comparing estimates in columns 4 and 5, controlling for color is important; clearly, some colors are more preferable than others. Even after controlling for color, however, the measured influence of list prices on purchase probabilities is large, rivaling that of selling price. Comparing coefficients in column 5, a \$1 increase in a product's list price has the same effect on purchase probabilities as a \$0.77 decrease in selling price, all else held constant. Considering that a firm can increase a firm's list price at virtually no cost, this has potentially huge consequences for producer and consumer welfare.

The ideal setting for measuring the effect of list prices on purchase likelihood is one in which list prices are randomly assigned to products, or vary exogenously within products over time or location. The current setting falls short of this ideal, but arguably comes close. The key identifying assumption is that list prices are uncorrelated with unobservable product characteristics after controlling for style and color. I argue that this is a weak assumption to make given the industry. For this assumption not to hold true, it would have to be the case that: (i) there exist particular colors and styles that are particularly good "matches" such that the fixed effects do not adequately control for product desirability, and (ii) the seller is able to identify these matches and sets list prices accordingly with consistent accuracy. The second condition is highly unlikely to be the case in an industry characterized by high demand uncertainty.

I include quadratic terms for list price and discount, respectively, to the baseline model and present the estimation results in Table 7. Somewhat puzzlingly, the estimates do not suggest a diminishing marginal effect of list prices on purchase likelihood. In fact, the estimates in the second column of Table 7 seem to suggest that discounts have an exponentially increasing positive effect on purchase

Table 7: Quadratic terms for list price and discount

| VARIABLES | (2)<br>List price | (3)<br>Discount |
|---|---|---|
| selling price $p_{jmt}$ | -0.00170*** | -0.000456** |
| | [2.51e-05] | [0.000227] |
| list price $LP_j$ | 0.00221*** | |
| | [0.000663] | |
| $LP_j^2$ | -1.41e-06 | |
| | [9.84e-07] | |
| discount$_{jmt}$ | | -0.0804*** |
| | | [0.0246] |
| discount$_{jmt}^2$ | | 0.00148*** |
| | | [0.000230] |
| factory$_j$ | -0.0807*** | -0.0798*** |
| | [0.00796] | [0.00796] |
| age$_{jt}$ | -0.000428*** | -0.000427*** |
| | [3.66e-06] | [3.67e-06] |
| constant | -6.753*** | -6.634*** |
| | [0.801] | [0.798] |
| Observations | 2,416,817 | 2,416,817 |
| R-squared | 0.371 | 0.371 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

likelihood. In the following subsections, I further explore this relationship by considering real versus fake list prices separately, measuring how the effect differs by consumer experience with the brand, and exploring the relevance of reference points.

## 4.2   Real and fake list prices

The presence of both real and fake list prices in the data enables a comparison of their effects on purchase probabilities. A reasonable hypothesis might be that fake list prices have less of an impact on purchase than a real list price. On the supply side, fake list prices are a lower commitment for the firm than real list prices, and may thus be less anchored to product quality. On the demand side, some consumers may observe the selling prices of items over time, and hence place more weight on list prices that have been realized. From a regulatory perspective, the question is of critical importance in determining the effects of fake prices on consumer welfare.

Table 8 contains results of regressions in which the effects of real and fake list prices are parsed. In the first model, an interaction term for list price and the factory dummy is included. This provides a direct measure of the difference in effects between real and fake list prices because only factory goods carry fake list prices. Surprisingly, the coefficient estimate on the interaction term implies that list prices on factory goods are even stronger inducements to purchase than those on original goods.

In the second column of Table 8 discount$_{jmt}$ is decomposed into real and fake components. For original goods, the entire discount is a real discount, and the fake discount is zero. For factory goods, the real discount is the difference between the current period's selling price and the maximum selling price observed in the data. The fake discount is the difference between the maximum selling price and the fake list price. Along similar lines to the specification in column 1, I find that the fake discount component has a larger impact on purchase behavior than the real discount component.

These results show that fake list prices and discounts have effects on purchase behavior that may rival those of real ones in magnitude. This raises interesting questions on the reasons behind this demand response, as well as its implications on firm decisions. In the succeeding analyses, I explore how consumer heterogeneity and reference points moderate these effects.

Table 8: Real and fake list prices

| VARIABLES | (1) | (2) |
|---|---|---|
| price $p_{jmt}$ | -0.00170*** | -0.000644*** |
| | [2.51e-05] | [0.000227] |
| list price $LP_j$ | 0.000670*** | |
| | [0.000227] | |
| $LP_j * \text{factory}_j$ | 0.00175*** | |
| | [8.23e-05] | |
| real discount$_{jmt}$ | | 0.00103*** |
| | | [0.000226] |
| fake discount$_{jmt}$ | | 0.00140*** |
| | | [0.000225] |
| factory$_j$ | -0.628*** | -0.0912*** |
| | [0.0269] | [0.00799] |
| age$_{jmt}$ | -0.000430*** | -0.000427*** |
| | [3.66e-06] | [3.66e-06] |
| constant | -6.529*** | -6.623*** |
| | [0.798] | [0.798] |
| Observations | 2,416,817 | 2,416,817 |
| R-squared | 0.371 | 0.371 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

### 4.3   Fake prices and consumer heterogeneity

Consumers who lack full information on product desirability may take price as a signal of quality (Gerstner 1985). The availability of demand data that include both list and selling prices presents an opportunity to cleanly measure this signaling effect separately from price sensitivity. If less-informed consumers are more reliant on price as a signal of quality, then they should demonstrate more sensitivity to list prices than better-informed consumers (Armstrong & Chen 2013).

The current context differs from the typical environment considered in theoretical models that characterize price as a signal of quality. First, here we have a single firm selling multiple goods, whereas the usual model has two or more firms of different "quality" with one representative product each. Second, a standard assumption is for quality to be increasing in marginal cost, with the higher-quality firm having a lower cost of quality, and hence a more credible commitment to keep prices high. In the current example, higher-quality products are not necessarily more expensive to produce, as desirability is greatly influenced by aesthetic components that do not affect production costs.

While the current context has not specifically been explored in prior research, there are similar and additional reasons why one might expect price to signal quality here. Even as a monopolist, a firm may have an incentive to guide new, uninformed consumers toward better options within its own product assortment so as to increase customer lifetime value. Fake list prices may play a special role given the cost structure: because quality is not strongly related to marginal cost, the ability to post fake list prices may relieve the tension of pricing against marginal cost to maximize profits (downward pressure) while depending on price to signal quality (upward pressure).

To explore how sensitivity to list prices relates to consumer familiarity with the brand, I bucket the purchase observations according to first-time and repeat consumers.[8] The assumption is that repeat consumers are better informed about product quality owing to their greater experience with the brand. I estimate the baseline regression model for each bucket and present the results in Table 9. The estimates suggest that repeat consumers are in fact more sensitive to list prices. This runs counter to the predictions of signaling models, suggesting that either the evolution of consumer

---

[8]Unfortunately, outside shares cannot be directly bucketed in the same way. I take the ratio of purchases of minor product categories and apply them to the outside shares for estimation purposes.

Table 9: New vs old consumers

| VARIABLES | (1) New consumers | (2) Old consumers |
|---|---|---|
| | | |
| selling price $p_{jmt}$ | -0.00802*** | -0.00815*** |
| | [3.77e-05] | [3.62e-05] |
| list price $LP_j$ | 0.00588*** | 0.00689*** |
| | [0.000302] | [0.000284] |
| product age | -2.67e-05*** | -9.53e-05*** |
| | [4.59e-06] | [4.30e-06] |
| factory dummy | 0.0289*** | -0.0366*** |
| | [0.00972] | [0.00898] |
| constant | -4.435*** | -4.332*** |
| | [0.489] | [0.340] |
| | | |
| Observations | 1,166,638 | 1,269,551 |
| R-squared | 0.444 | 0.411 |

Standard errors are in brackets.
Style and color dummies included in regression.
*** p<0.01, ** p<0.05, * p<0.1

information or the role of list prices is more complex.

As an alternative approach, I limit the sample to include only old consumers, and then divide the sample according to consumers who have visited the regular store in the past and those who have not. The corresponding estimates are reported in Table 10, where column 1 contains estimates from a sample with customers who have only shopped at the outlet store, and column 2 contains estimates from a sample with customers who have bought a least one item from the regular store. Strikingly, although full-price shoppers are much less sensitive to selling prices than pure outlet shoppers, they share almost the same sensitivity to list price.[9]

These estimates imply that while a list price may function as a signal of quality, it works in conjunction with other factors. It is also likely that the signaling mechanism is more nuanced than what these simple demand models can capture. Perhaps most importantly, this evidence runs counter to the simple narrative that fake list prices merely deceive uninformed consumers.

---

[9]Table B in the appendix estimates the interaction between list prices and the factory dummy for the two groups. As with regression including the full sample of consumers, both groups place higher weight on fake list prices on factory goods, although consumers who have previously visited the full-price channel seem to place a relatively lighter emphasis.

Table 10: Pure outlet vs full-price shoppers

| VARIABLES | (1) Pure outlet | (2) Full-price |
|---|---|---|
| selling price $p_{jmt}$ | -0.00955*** | -0.00517*** |
| | [6.39e-05] | [4.73e-05] |
| list price $LP_j$ | 0.00673*** | 0.00608*** |
| | [0.000725] | [0.000387] |
| product age | -1.45e-05*** | -6.31e-05*** |
| | [2.00e-06] | [8.98e-06] |
| factory dummy | 0.0352*** | -0.0317*** |
| | [0.00578] | [0.00733] |
| constant | -4.245*** | -4.750*** |
| | [0.285] | [0.486] |
| | | |
| Observations | 1,085,735 | 1,118,885 |
| R-squared | 0.493 | 0.524 |

Standard errors are in brackets.
Style and color dummies included in regression.
*** p<0.01, ** p<0.05, * p<0.1

Thus far, the estimation has permitted list prices to affect demand only as absolute quantities, without allowing for possible dependence of the effect on particular reference points. Prior research has established the relevance of reference points in similar settings (e.g. Mayhew & Winer 1992, Rajendran & Tellis 1994) as well as reasons for setting fake list prices that stem from reference dependence (Armstrong & Chen 2013, Bordalo et al. 2013). In the following section I allow for reference dependence and explore its implications.

## 4.4   Reference points

The notions of price as a signal of quality and bargain-hunting behavior among consumers are closely linked in this empirical setting. An offered discount can only be considered a genuine "deal" if the original price is a dependable measure of the product's quality. Contextual reference points may influence shoppers' judgment in this regard (Rajendran & Tellis 1994). The extent to which consumers respond to high original prices, or equivalently high discounts, may depend on the average level of discounting, the dispersion in discounts, or other reference points.

In what follows I focus on reference points that are specific to a store-month, as opposed to reference

24

points that are specific to products or arise from prior time periods. Given the infrequency of purchase in the product category, it is highly unlikely that price levels in previous periods form relevant reference points on the product level. The hypothesis is that a consumer's valuation of a specific discount offer is influenced by its distance to a reference point related to other offers in the store during the same shopping occasion (e.g. Tversky & Kahneman 1985, Lattin & Bucklin 1989). These reference points, termed contextual (vs temporal) by Rajendran & Tellis (1994) and external (vs internal) by Mayhew & Winer (1992) have been shown in the prior literature to frequently outweigh other reference points.

I consider two reference points that a consumer may be working off in judging the value of an offered discount: the lowest available discount in the store and the average available discount in the store. These reference points correspond to those examined by Rajendran & Tellis (1994), but differ in that these focus on the distribution of discounts rather than prices.

I operationalize the estimation of these reference points differently from prior literature. I decompose each product's discount into a store-wide reference point and the product-specific distance from this reference point, where $lowest\_discount_{mt}$ is the lowest offered discount in the store[10], $average\_discount_{mt}$ is the average discount in the store, and $distance1_{jmt}$ and $distance2_{jmt}$ are the respective distances. A significant difference in the estimated coefficients for the reference point and the corresponding product-specific distance would provide supporting evidence for the reference point's relevance in consumer decision-making.

The results, presented in Table 11, strongly suggest that the lowest offered discount in the store serves as an important reference point. In fact, as seen in column 2 of Table 11, the entire impact of a discount on purchase likelihood comes from its distance from this reference point. Strikingly, purchase likelihood is invariant to the level of the reference point itself. The estimated coefficients for $average\_discount_{mt}$ and $distance2_{jmt}$, while statistically different from each other, are much closer in magnitude than those for $lowest\_discount_{mt}$ and $distance1_{jmt}$. This mirrors the result from Rajendran & Tellis (1994), in which the lowest in-store price is found to be more salient to consumers than the average price.

---

[10]The lowest offered discount is never zero in the firm's outlet stores, from which the data for this analysis has been collected.

Table 11: Reference points

| VARIABLES | (1)<br>Baseline | (2)<br>Lowest discount | (3)<br>Average discount |
|---|---|---|---|
| price $p_{jmt}$ | -0.000383*<br>[0.000226] | -0.000433*<br>[0.000226] | -0.000378*<br>[0.000226] |
| discount$_{jmt}$ | 0.00132***<br>[0.000225] | | |
| distance1$_{jmt}$ | | 0.00162***<br>[0.000225] | |
| lowest_discount$_{mt}$ | | -8.83e-05<br>[0.000229] | |
| distance2$_{jmt}$ | | | 0.00129***<br>[0.000225] |
| average_discount$_{mt}$ | | | 0.00146***<br>[0.000231] |
| factory$_j$ | -0.0807***<br>[0.00796] | -0.0652***<br>[0.00797] | -0.0827***<br>[0.00799] |
| age$_{jmt}$ | -0.000428***<br>[3.66e-06] | -0.000408***<br>[3.71e-06] | -0.000430***<br>[3.76e-06] |
| constant | -6.650***<br>[0.798] | -6.563***<br>[0.798] | -6.669***<br>[0.798] |
| Observations | 2,416,817 | 2,416,817 | 2,416,817 |
| R-squared | 0.371 | 0.371 | 0.371 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

26

These results resolve two puzzles from earlier estimates. The insignificant effect of a discount up to the minimum level offered in a store explains the exponentially increasing effect of list prices presented in Table 7. Given that original goods carry lower discounts on average (see Figure 2), this also demonstrates why the estimates in Table 8 imply that fake list prices have a larger effect on purchases than real ones.

A look at the distribution of available discounts over time suggests that the firm has been decreasing the dispersion of available discounts even as it increases the average (*se*e Figure A in the appendix). At the same time, the firm has been decreasing the scope of product-specific discounts relative to market-specific discounts. The results in this section would imply that the firm should reconsider this strategy, and instead pay closer attention to the lower end of discount magnitudes in its stores, which consumers seem to treat as a salient baseline.

These results also point to the flip side of fictitious pricing. While fake discounts may drive revenues for individual products, over time consumers may take the overall level of discounting as a given and "discount" the discounts (e.g. Gupta & Lee 1992, Marshall & Leng 2002). Indeed, the estimates show that consumers take the discount floor for granted. Even though, as the estimates in Table 8 imply, consumers may have a poor ability to distinguish real from fake discounts, the proliferation of discounts may be disciplined by reference dependence.

## 4.5   Intertemporal substitution

The static framework adopted in this paper is only appropriate if, as the market environment suggests, consumers do not delay their purchases in expectation of higher discounts in the future. Consumers have been documented to time their purchases to correspond with periodic promotions (e.g. Hendel & Nevo 2011) or to take advantage of declining prices over time (e.g. Nair 2007). If this behavior exists in a market and is ignored in demand estimation then the estimated coefficient on price may be biased. I argue that the empirical setting considered here is not conducive to either of these substitution behaviors. Unlike those in grocery stores, outlet store promotions are irregularly timed and difficult to schedule visits over. Although the selling price for each product does systematically decline over time, so does the product's inherent attractiveness as a fashion

Table 12: Past-period price effects

|  | (1) |
|---|---|
| price $p_{j,t}$ | -0.00132*** |
|  | [3.89e-05] |
| previous price $p_{j,t-1}$ | -0.000782*** |
|  | [4.02e-05] |
| $LP_j$ | 0.00114*** |
|  | [2.49e-05] |
| age$_{jmt}$ | -0.000294*** |
|  | [1.12e-05] |
| factory$_j$ | -0.0861*** |
|  | [0.00947] |
| constant | -6.401*** |
|  | [0.142] |
| Observations | 1,771,541 |
| R-squared | 0.375 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

good.

I include past-period selling price $p_{j,t-1}$ in the regression equation to assess if intertemporal substitution is in fact an important factor in purchase decisions. Controlling for the current period's price, the coefficient on the past period's price should be positive if consumers time their purchases to take advantage of lower prices. The estimated coefficient turns out to be negative and statistically significant but small (see Table 12), suggesting a lack of intertemporal substitution.

## 5   Conclusion

Price comparisons of practically every shape and form have been heavily used by retailers in their communications from the very earliest examples of retail advertising up to the current shift to e-commerce. The question of how these signals affect purchase behavior is relevant to firms, regulators, and consumers themselves. Firms, in posting list prices different from selling prices, possess a potentially powerful driver of demand that is virtually costless to produce and adjust. Regulators face the challenge of assessing whether list prices inform or deceive, and ultimately whether they

28

enhance or damage consumer welfare. Consumers may be surprised to find out how list prices are determined, and the extent to which their own decisions are reliant on them.

The results show that list prices have significant effects on purchase decisions that may operate through several channels. On average, consumers may be thought of as assigning a monetary value to list prices at over 70 "selling price cents" to a "list price dollar." This rate seems invariant to the consumer's depth of experience with a brand, with repeat customers placing as much weight on list prices as new customers.

In addition, consumer values for discounts depend on market-specific reference points. The minimum offered discount in a store is appears to be a highly influential reference point, with product-specific discounts being judged according to their distances from this minimum. In addition, the magnitude of the minimum discount itself appears have little effect on purchase likelihoods. These suggest that optimal price-setting by the firm should incorporate reference dependence in consumer behavior.

The empirical setting in this paper induces some limitations. The single-firm data source used in this paper precludes studying the competitive aspects of fake list pricing, such as possible impacts on consumers' likelihood of further search (e.g. Grewal & Compeau 1992). Although, to my knowledge, this paper is the first to exploit real transactions data to investigate fake list prices, identification of the effect of fake pricing on purchase likelihood also falls short of that which may be obtained from field experimentation.

Given the effect of list prices on purchase behavior, a potentially worthwhile area for future research lies in empirically modeling the seller's problem when setting fake list prices. The persistence of fake pricing despite frequent high-profile lawsuits against the practice suggests that it is indeed profitable for sellers to pursue. On the other hand, the practice does seem to be disciplined by natural constraints that result in its familiar patterns within industries. It would be of particular interest for regulators to identify these constraints in their efforts to curtail this practice and protect consumer interests.

Differences between industries may also merit future investigation. The existing scholarly literature on price as a signal of quality and regulatory guidelines frequently cast "fictitious" list prices

as a means of deceiving uninformed consumers. This literature relies on the strictly monotonic relationship of quality and marginal cost as providing credibility to actual selling price as a signal of quality. Some industries may be better represented by production functions in which quality is generated through a stochastic process only weakly correlated with marginal cost, with fake list prices used to reduce asymmetric information about quality between the firm and consumers. Such a viewpoint may better suit settings in which quality can only imperfectly be set by firms, such as in fashion and design related industries.

# References

[1] Armstrong, Mark, and Yongmin Chen. "Discount pricing." Mimeo. (2012).

[2] Berry, Steven T. "Estimating discrete-choice models of product differentiation." The RAND Journal of Economics (1994): 242-262.

[3] Bagwell, Kyle, and Michael H. Riordan. "High and declining prices signal product quality." The American Economic Review (1991): 224-239.

[4] Biswas, Abhijit, and Edward A. Blair. "Contextual effects of reference prices in retail advertisements." The Journal of Marketing (1991): 1-12.

[5] Blair, Edward A., and E. Laird Landon Jr. "The effects of reference prices in retail advertisements." The Journal of Marketing (1981): 61-69.

[6] Bordalo, Pedro, Gennaioli, Nicola, and Andrei Shleifer. "Salience and consumer choice." The Journal of Political Economy (2013): 803-843.

[7] Della Bitta, Albert J., Kent B. Monroe, and John M. McGinnis. "Consumer perceptions of comparative price advertisements." Journal of Marketing Research (1981): 416-427.

[8] Dodds, William B., Kent B. Monroe, and Dhruv Grewal. "Effects of price, brand, and store information on buyers' product evaluations." Journal of Marketing Research (1991): 307-319.

[9] Dolan, Maura. "Kohl's can be sued over sale ads, court says." *Los Angeles Times*. May 22, 2013.

[10] Friedman, David Adam. "Reconsidering Fictitious Pricing." Minn. L. Rev. 100 (2015): 921.

[11] Gerstner, Eitan. "Do higher prices signal higher quality?" Journal of Marketing Research (1985): 209-215.

[12] Greenleaf, Eric A. "The impact of reference price effects on the profitability of price promotions." Marketing Science 14.1 (1995): 82-104.

[13] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" Journal of Public Policy & Marketing (1992): 52-62.

[14] Gupta, Sunil, and Lee G. Cooper. "The discounting of discounts and promotion thresholds." Journal of Consumer Research 19.3 (1992): 401-411.

[15] Hastings, Justine, and Jesse M. Shapiro. "Mental accounting and consumer choice: Evidence from commodity price shocks." No. w18248. National Bureau of Economic Research, 2012.

[16] Hendel, Igal, and Aviv Nevo. "Intertemporal price discrimination in storable goods markets." No. w16988. National Bureau of Economic Research, 2011.

[17] Kumar, V., et al. "The impact of internal and external reference prices on brand choice: the moderating role of contextual variables." Journal of Retailing 74.3 (1998): 401-426.

[18] Lattin, James M., and Randolph E. Bucklin. "Reference effects of price and promotion on brand choice behavior." Journal of Marketing Research (1989): 299-310.

[19] Marshall, Roger, and Seow Bee Leng. "Price threshold and discount saturation point in Singapore." Journal of Product & Brand Management 11.3 (2002): 147-159.

[20] Mayhew, Glenn E., and Russell S. Winer. "An empirical analysis of internal and external reference prices using scanner data." Journal of Consumer Research 19.1 (1992): 62-70.

[21] Monroe, Kent B., and Joseph D. Chapman. "Framing effects on buyers' subjective product evaluations." ACR North American Advances (1987).

[22] Nair, Harikesh. "Intertemporal price discrimination with forward-looking consumers: Application to the US market for console video-games." Quantitative Marketing and Economics 5.3 (2007): 239-292.

[23] Pitofsky, Robert, Randal Shaheen, and Amy Mudge. "Pricing Laws Are No Bargain for Consumers." Antitrust 18 (2003): 62.

[24] Popken, Ben. "JCPenney, Sears, Macy's and Kohl's Sued For 'Fake' Sale Pricing." NBC News, https://www.nbcnews.com/business/consumer/jcpenney-sears-macy-s-kohl-s-sued-fake-sale-pricing-n694101. Accessed 29 September 2017.

[25] Rajendran, Kharan N., and Gerard J. Tellis. "Contextual and temporal components of reference price." The Journal of Marketing (1994): 22-34.

[26] Thaler, Richard. "Mental accounting and consumer choice." Marketing Science 4.3 (1985): 199-214.

[27] Tversky, Amos, and Daniel Kahneman. "The framing of decisions and the psychology of choice." Environmental Impact Assessment, Technology Assessment, and Risk Analysis. Springer, Berlin, Heidelberg, 1985. 107-129.

[28] Urbany, Joel E., William O. Bearden, and Dan C. Weilbaker. "The effect of plausible and exaggerated reference prices on consumer perceptions and price search." Journal of Consumer Research 15.1 (1988): 95-110.

# Appendix

Table A: Frequency of list price values

| List price | Percent of products | Average transacted price | Discount | Percent original styles |
|---:|---:|---:|---:|---:|
| 298 | 15.84 | 114.63 | 60.68 | 40.80 |
| 398 | 10.87 | 149.30 | 61.21 | 45.65 |
| 358 | 9.14 | 141.59 | 59.93 | 37.93 |
| 348 | 6.54 | 123.45 | 63.82 | 61.45 |
| 328 | 6.38 | 104.72 | 67.30 | 74.07 |
| 198 | 5.67 | 96.00 | 50.52 | 9.72 |
| 278 | 4.33 | 113.80 | 58.13 | 12.73 |
| 498 | 4.02 | 190.59 | 61.08 | 17.65 |
| 268 | 3.62 | 102.72 | 59.97 | 32.61 |
| 598 | 3.23 | 249.80 | 57.55 | 9.76 |
| 248 | 2.60 | 91.30 | 62.32 | 57.58 |
| 258 | 2.52 | 91.38 | 61.35 | 6.25 |
| 458 | 2.29 | 150.79 | 66.45 | 27.59 |
| 428 | 2.29 | 149.41 | 64.37 | 72.41 |
| 378 | 2.21 | 129.50 | 64.31 | 60.71 |

Table B: Consumer sensitivity to list prices by previous purchase channel

| Shopper type | (1) Pure outlet | (2) Pure outlet | (3) Full-price | (4) Full-price |
|---|---|---|---|---|
| $p_j$ | -0.00955*** | -0.00955*** | -0.00517*** | -0.00517*** |
| | [6.39e-05] | [6.39e-05] | [4.73e-05] | [4.73e-05] |
| $LP_j$ | 0.00673*** | 0.00256*** | 0.00608*** | 0.00420*** |
| | [0.000725] | [0.000482] | [0.000387] | [0.000167] |
| $LP_j \times factory$ | | 0.00885*** | | 0.00633*** |
| | | [0.000221] | | [0.000467] |
| constant | -4.245*** | -4.328*** | -4.750*** | -4.775*** |
| | [0.285] | [0.291] | [0.486] | [0.487] |
| | | | | |
| Observations | 1,085,735 | 1,085,735 | 1,118,885 | 1,118,885 |
| R-squared | 0.493 | 0.493 | 0.524 | 0.524 |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

Figure A: Average discount percent in outlet stores



Figure B: Prices over time

